USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-2041 UNITED STATES OF AMERICA, Appellant, v. RICHARD A. HORN, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Joseph A. DiClerico, Jr., U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _________________________ Ellen R. Meltzer, Special Counsel, Fraud Section, U.S. Dep't ________________ of Justice, with whom Peter E. Papps, United States Attorney, and ______________ Alexander Weir III, Trial Attorney, U.S. Dep't of Justice, were on brief, for the United States. Christopher R. Goddu and Peter G. Callaghan, with whom James ____________________ __________________ _____ M. Costello, Robert E. McDaniel, Devine, Millimet & Branch P.A., ___________ ___________________ ______________________________ Steven M. Gordon, Shaheen, Cappiello, Stein & Gordon, William E. ________________ ___________________________________ __________ Brennan, Timothy I. Robinson, and Brennan, Caron, Lenehan & _______ ____________________ ___________________________ Iacopino were on consolidated brief, for appellees. ________ _________________________ July 25, 1994 _________________________ SELYA, Circuit Judge. We decide today a question of SELYA, Circuit Judge. _____________ first impression: Do principles of sovereign immunity bar a federal district court, exercising its supervisory power, from assessing attorneys' fees and costs against the federal government in a criminal case? We answer this question affirmatively and, therefore, annul the district court's fee- shifting orders. I. FACTUAL BACKGROUND I. FACTUAL BACKGROUND This appeal arises out of unpardonable misconduct committed by a federal prosecutor who should have known better. The factual background of the criminal case in which the misconduct occurred a multi-defendant prosecution for, inter _____ alia, conspiracy to defraud a federally insured financial ____ institution is memorialized in a recent opinion of this court. See United States v. Lacroix, ___ F.3d ___, ___ (1st Cir. 1994) ___ _____________ _______ [No. 93-1845, slip op. at 2-4]. The facts pertaining to the misconduct are recounted in the opinion below. See United States ___ _____________ v. Horn, 811 F. Supp. 739, 741-44, 748-51 (D.N.H. 1992). For ____ purposes of deciding the abstract question of law that confronts us today, we largely omit the former set of facts, and limn the latter in less than exegetic detail. In mid-1992, a federal grand jury returned a 102-count indictment against seven individuals allegedly involved in a conspiracy to market and sell newly constructed homes by fraudulent means. The indictment charged violations of 18 U.S.C. 2371, 1014 and 1344. The prosecutors who controlled the case 2 were members of the Justice Department's "New England Bank Fraud Task Force," so called. The defendants, none of whom were indigent, obtained counsel at their own expense. During pretrial proceedings, the government made more than 10,000 documents available for inspection at the Boston office of Aspen Systems, an independent document management firm retained by the Task Force. On November 9, 1992, an attorney representing defendants Matthew Zsofka, John Lee, and Evangelist Lacroix visited the document repository to search for papers that might prove helpful in cross-examination. A government paralegal volunteered to have a member of Aspen's clerical staff photocopy any document that caught the lawyer's eye. The attorney accepted the offer. When the paralegal mentioned this undertaking to the lead prosecutor, she was instructed to have the Aspen employee make an extra copy of each defense-selected document for the government's edification. Defense counsel was not informed of this added flourish. To paraphrase the Scottish poet, the best-laid schemes of mice and prosecutors often go awry. Cf. Robert Burns, To a ___ ____ Mouse (1785). When the photocopying of desired documents took _____ longer than seemed reasonable, the defense attorney smelled a rat. A cursory investigation uncovered the prosecution's experiment in duplicitous duplication. The lawyer promptly demanded that the government return its copies of the papers culled by the defense. When his demand fell on deaf ears, he immediately drafted a motion to seal, filed the motion with the 3 district court, and servedit before theclose of business thatday. At this delicate juncture, the lead prosecutor poured kerosene on a raging fire.1 She did not passively await the court's ruling on the motion, but, instead, during the three days that elapsed before the district court took up the motion, the prosecutor reviewed the surreptitiously duplicated documents, discussed them with two of her subalterns, and used them to prepare a key prosecution witness (in the presence of a second possible witness). Thus, by November 13, 1992, when the court granted the motion to seal and explicitly instructed the lead prosecutor not to make further use of the papers singled out by the defense or take further advantage of the situation, appreciable damage already had been done. The lead prosecutor then made a bad situation worse. Two pages mysteriously disappeared from the lead prosecutor's cache of ill-gotten documents before the set was submitted to the district court for sealing. And in direct defiance of the court's order, the lead prosecutor prepared a complete new set for her own use. Adding insult to injury, she next signed an affidavit of somewhat questionable veracity. Finally, when she appeared before the district court to discuss the bizarre game ____________________ 1The district court made a deliberate decision to spare the lead prosecutor public humiliation and revised its order before publication to delete any mention of the prosecutor's name. Although we, if writing on a pristine page, might not be so solicitous, we honor the district court's exercise of its discretion, mindful that its choice has substantive implications. Cf. United States v. Hasting, 461 U.S. 499, 506 n.5 (1983) ___ _____________ _______ (listing public chastisement of errant attorney as a permissible form of sanction for misconduct). 4 she had been playing, she made a series of inconsistent statements evincing what the court charitably called a "lack of candor." Horn, 811 F. Supp. at 749, 750 n.4. ____ From the outset, defendants Zsofka, Lee, and Lacroix had mounted a cooperative defense. Thus, the three of them were equally vulnerable to the misconduct that occurred. Not surprisingly, the trio moved to dismiss the case on the ground of prosecutorial misconduct.2 The government objected. In evaluating the motions, the lower court ruled that the current selection during the discovery phase of a pending case offers insight into counsel's thoughts, and, therefore, constitutes privileged work product. See id. at 745-47 (citing In re San ___ ___ __________ Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007 (1st Cir. ______________________________________ 1988)). After rejecting the government's argument that the privilege had been waived, the court determined that the lead prosecutor, by furtively copying and thereafter reviewing the selected documents, crossed the ethical line. The court further ruled that this prosecutorial misconduct not only violated the defendants' work-product privilege, but also abridged their Fifth Amendment right to due process and their Sixth Amendment right to ____________________ 2For ease in reference, we call Zsofka, Lee, and Lacroix "the appellees." Withal, we note that the district court permitted three other defendants Richard Horn, Patrick Dion, and Patricia Dion to join in the request for dismissal. See ___ Horn, 811 F. Supp. at 744-45. Though they had no connection to ____ the duped attorney, these three defendants ultimately received modest fee awards. Notwithstanding, their monetary interest in this appeal, they eschewed the filing of appellate briefs. Consequently, we make no further reference to them or to a seventh defendant, Susan Yildiz, who entered into a plea agreement before the misconduct occurred. 5 effective assistance of counsel. See id. at 747-52. ___ ___ Finding prejudice, but not a stain so indelible as to justify dismissing the indictment, see id. at 751, the court ___ ___ stitched together a serviceable fabric of narrowly tailored remedies, see id. at 751-52. The court ordered the government to ___ ___ provide the defense with summaries of its witnesses' testimony and lists of its exhibits; permit the defense to depose the two potential witnesses who had been exposed to the bootleg documents; refrain from referring at trial to the substance of the documents except in response to defense references; and remove the lead prosecutor from the case. See id. at 752. ___ ___ Additionally, the court referred the lead prosecutor to the disciplinary committees of her two bar associations, and, in the portion of its order that sparked the current controversy, the court directed the government to pay the fees and costs incurred by the defendants in litigating the misconduct issue. See id. ___ ___ Although the court's original order was inexplicit concerning the source of its authority to assess fees and costs, the court, in denying the government's motion to reconsider, explained that it grounded this sanction in the judiciary's supervisory power. See ___ id. at 753-54. ___ Zsofka, Lee, and Lacroix stood trial early in 1993. They were each convicted on at least one count, and were sentenced in July.3 On August 18, 1993, the district court ____________________ 3The other four defendants pled guilty at various times. They were all sentenced in May of 1993. 6 quantified its earlier order, assessing a grand total of $46,477.80 in fees and costs. The other sanctions have been carried out and the defense no longer presses the claim that the district court should have dismissed the indictment. Hence, all that remains of the case is the government's appeal from the assessment of fees. The government contests the award chiefly on the ground that it is prohibited by principles of sovereign immunity.4 Extracted from its complicated factual predicate, drained of rancor, and separated from other, essentially extraneous disputes, this appeal requires us to serve as the dispatcher at a crossing where two powerful engines the judiciary's supervisory power and the government's sovereign immunity are on a collision course. II. DOCTRINAL BACKGROUND II. DOCTRINAL BACKGROUND In ascertaining what happens when doctrines clash, derivation frequently becomes important. Thus, we turn to this task. A. Supervisory Power. A. Supervisory Power. _________________ Supervisory power, sometimes known as inherent power, encompasses those powers which, though "not specifically required by the Constitution or the Congress," United States v. Hasting, _____________ _______ ____________________ 4The government also maintains that it could not have violated any applicable work-product privilege, and cannot be penalized for so doing, because the defense waived any such privilege by making voluntary disclosures to a government agent, namely, the Aspen office worker. Because we agree that the government is shielded from the monetary award by principles of sovereign immunity, we take no view of this asseveration. 7 461 U.S. 499, 505 (1983), are nonetheless "necessary to the exercise of all others," Roadway Express, Inc. v. Piper, 447 U.S. _____________________ _____ 752, 764 (1980) (quoting United States v. Hudson, 11 U.S. (7 ______________ ______ Cranch) 32, 34 (1812)). See generally United States v. Santana, ___ _________ _____________ _______ 6 F.3d 1, 9-10 (1st Cir. 1993). Although the doctrine's ancestry can be traced to the early days of the Republic, see, e.g., Hudson, 11 U.S. at 34; see ___ ____ ______ ___ also Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510 (1873) ____ __ _____ ________ (observing that the "moment the courts of the United States were called into existence . . . they became possessed of [inherent] power"), a full-scale genealogical dig would serve no useful purpose. It suffices to say that the doctrine emerged in modern form roughly a half-century ago, see McNabb v. United States, 318 ___ ______ _____________ U.S. 332, 341 (1943), and it has since developed most robustly in the area of criminal procedure, see Sara Sun Beale, Reconsidering ___ _____________ Supervisory Power in Criminal Cases, 84 Colum. L. Rev. 1433, ______________________________________ 1435-64 (1984). While supervisory power is sometimes understood to derive from the Constitution, either as incidental to the Article III grant of judicial power, see id. at 1464-83, or as ___ ___ implicit in the separation of powers, see Eash v. Riggins ___ ____ _______ Trucking, Inc., 757 F.2d 557, 562 (3d Cir. 1985), the Court has ______________ made it clear that, at least as a general proposition, Congress may limit the power of lower federal courts by rule or statute, see Chambers v. NASCO, Inc., 501 U.S. 32, 47 (1991).5 ____________ ___________ ____________________ 5It is not yet settled whether some residuum of the courts' supervisory power is so integral to the judicial function that it may not be regulated by Congress (or, alternatively, may only be 8 In what is not necessarily an exhaustive listing, the Court has recognized three purposes to which the supervisory power may be dedicated: "to implement a remedy for violation of recognized rights, to preserve judicial integrity . . . and . . . as a remedy designed to deter illegal conduct." Hasting, 461 _______ U.S. at 505 (internal citations omitted). Invoking this third theme, we have warned that we will consider unleashing the supervisory power in criminal cases "[w]hen confronted with extreme misconduct and prejudice," in order "to secure enforcement of `better prosecutorial practice and reprimand of those who fail to observe it.'" United States v. Osorio, 929 ______________ ______ F.2d 753, 763 (1st Cir. 1991) (quoting United States v. Pacheco- _____________ ________ Ortiz, 889 F.2d 301, 310-11 (1st Cir. 1989)). _____ The supervisory power has definite limits. See ___ Hasting, 461 U.S. at 505. For one thing, the supervisory power _______ doctrine is interstitial in the sense that it applies only when there is no effective alternative provided by rule, statute, or constitutional clause. See Chambers, 501 U.S. at 50-51. For ___ ________ another thing, even when inherent powers legitimately can be invoked, they must be exercised with restraint and circumspection, both "because [they] are shielded from direct ____________________ regulated up to a certain point). In this connection, we note that, although some courts of appeals have attempted to subdivide the supervisory power into three categories ranged along a continuum according to their degree of necessity, and, concomitantly, the extent to which they may be subject to congressional limitation, see In re Stone, 986 F.2d 898, 901-03 ___ ____________ (5th Cir. 1993); Eash, 757 F.2d at 562-63, the Supreme Court has ____ expressly declined to adopt this taxonomy, see Chambers, 501 U.S. ___ ________ at 48 n.12. 9 democratic controls," Roadway Express, 447 U.S. at 764, and _______________ "[b]ecause of their very potency," Chambers, 501 U.S. at 44. ________ In particular, it is inappropriate for courts to attempt to use the supervisory power to justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective. See Hasting, 461 U.S. at 506 (overturning use of ___ _______ supervisory power to deter prosecutorial misconduct through reversal of conviction). It is equally inappropriate for a court to gear up the supervisory power in an effort to circumvent a limitation firmly established under conventional doctrine. See ___ Bank of Nova Scotia v. United States, 487 U.S. 250, 254-55 (1988) ___________________ _____________ (overturning use of supervisory power to evade the harmless error inquiry; United States v. Payner, 447 U.S. 727, 735-36 (1980) _____________ ______ (overturning use of supervisory power to craft a new exclusionary rule designed to reach situations in which the constitutional exclusionary rule is not triggered). Illustrating the same point, this court has ruled it inappropriate to use the supervisory power to redress misconduct that did not result in harm, see Santana, 6 F.3d at 11 (citing cases), or that resulted ___ _______ in harm to someone other than the complaining defendants, see id. ___ ___ It has been squarely held that a court's array of supervisory powers includes the power to assess attorneys' fees against either parties or their attorneys in befitting situations. See Roadway Express, 447 U.S. at 764-67; In re ___ ________________ _____ Cordova Gonzalez, 726 F.2d 16, 20 (1st Cir. 1984). The Court ________________ 10 recently reaffirmed this rule, see Chambers, 501 U.S. at 49, and ___ ________ clarified its contours. While a court may invoke its supervisory power to assess fees only when the fees are intended as a sanction responding to a display of bad faith, the bad faith may occur in connection with "a full range of litigation abuses." Id. at 46. Moreover, even though a particular abuse is covered ___ by a specific statute or rule, a court still may invoke its supervisory power to address the abuse if the existing remedial provision is inadequate to the task. Id. at 50-51. ___ B. Sovereign Immunity. B. Sovereign Immunity. __________________ The principle of sovereign immunity, in its primary form, dictates that the United States may not be sued except with its consent. This tenet was first stated, ipse dixit, by Chief ____ _____ Justice Marshall in Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, ______ ________ 411-12 (1821) (dictum). It has been reaffirmed as recently as this past term. See FDIC v. Meyer, 114 S. Ct. 996, 1000 (1994); ___ ____ _____ see also Gonsalves v. IRS, 975 F.2d 13, 16 (1st Cir. 1992) (per ___ ____ _________ ___ curiam). The secondary principle that monetary penalties cannot be collected from the federal government absent its consent was first articulated, in the narrow context of an assessment for costs, in United States v. Hooe, 7 U.S. (3 Cranch) 73, 90-91 ______________ ____ (1805). However, the Hooe Court made no explicit reference to ____ sovereign immunity, and it was not until four decades later that the two principles formally converged, see United States v. ___ _____________ McLemore, 45 U.S. (4 How.) 286, 287-88 (1846). They have been ________ 11 taken in tandem ever since in cases involving costs. See, e.g., ___ ____ United States v. Bodcaw, 440 U.S. 202, 203-04 n.3 (1979) (per _____________ ______ curiam); Fairmont Creamery Co. v. Minnesota, 275 U.S. 70, 73-74 _____________________ _________ (1927); United States v. Chemical Found., Inc., 272 U.S. 1, 20 _____________ ______________________ (1926); Shewan v. United States, 267 U.S. 86, 87 (1925). ______ _____________ The Supreme Court recently removed any vestige of doubt that may have lingered as to whether these cases envisioned sovereign immunity as a bar not only to costs but also to attorneys' fees.6 See Ruckelshaus v. Sierra Club, 463 U.S. 680, ___ ___________ ___________ 685 (1983) (holding that, waiver aside, sovereign immunity bars the shifting of attorneys' fees against the federal government) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. __________________________ ________________ 240, 267-68 & n.42 (1975)). Since then, the proposition that sovereign immunity bars the recovery of attorneys' fees has become ensconced at the circuit level. See, e.g., In re Turner, ___ ____ ____________ 14 F.3d 637, 640 (D.C. Cir. 1994) (per curiam); In re Perry, 882 ____________ F.2d 534, 543-44 (1st Cir. 1989); Campbell v. United States, 835 ________ _____________ F.2d 193, 195 (9th Cir. 1987); Ewing & Thomas, P.A. v. Heye, 803 ____________________ ____ F.2d 613, 616 (11th Cir. 1986). Civil and administrative penalties against the government are subject to the same prohibition, see, e.g., Department of Energy v. Ohio, 112 S. Ct. ___ ____ ____________________ ____ 1627, 1631 (1992), as is interest on (congressionally permitted) ____________________ 6We think it is unlikely that such doubts were entertained in earnest. After all, Congress would not have felt impelled to enact the many statutes waiving immunity to attorneys' fees, see ___ 1 Mary Frances Derfner & Arthur D. Wolf, Court Awarded Attorneys' ________________________ Fees 5.03[12][b] (1993) (cataloguing statutes), unless it ____ understood that, in the absence of such statutes, attorneys' fees would not be recoverable against the federal sovereign. 12 court awards, see, e.g., Library of Congress v. Shaw, 478 U.S. ___ ____ ____________________ ____ 310, 314 (1986). Viewed against this austere backdrop, we think it is fair to say that, by common understanding, the secondary principle of sovereign immunity operates on the broadest possible level: it stands as an obstacle to virtually all direct assaults against the public fisc, save only those incursions from time to time authorized by Congress. Those who seek a deep understanding of the law's profundities are likely to find sovereign immunity a frustrating topic, for, from the very beginning, sovereign immunity has been "accepted as a point of departure unquestioned," Cunningham v. __________ Macon & Brunswick R.R., 109 U.S. 446, 451 (1883), or, put another ______________________ way, simply taken at face value and "treated as an established doctrine," United States v. Lee, 106 U.S. 196, 207 (1882). ______________ ___ Although we know relatively little, we do know that the doctrine derives from the common law tradition that the king should be insulated from suit absent his consent. See, e.g., Fairmont ___ ____ ________ Creamery, 275 U.S. at 73; see also Chisolm v. Georgia, 2 U.S. (2 ________ ___ ____ _______ _______ Dall.) 419, 435-45 (1793) (Iredell, J., dissenting) (discussing historical origins of doctrine). To be sure, this tradition could not be transplanted root and branch into a system where sovereignty was diffused both vertically (by federalism) and horizontally (by the separation of powers). Accordingly, in regard to the federal government, the law adapted the doctrine in such a way that Congress inherited the king's sovereign role of granting consent to be sued. See Chisolm, 2 U.S. at 436 ___ _______ 13 (Iredell, J., dissenting). One consequence of this adaptation is that executive officers lack the power to waive the federal government's sovereign immunity. See United States v. Shaw, 309 ___ _____________ ____ U.S. 495, 501 (1940); Munro v. United States, 303 U.S. 36, 41 _____ _____________ (1938); Chemical Found., 272 U.S. at 20-21. _______________ Courts have mentioned two rationales for retaining the adapted doctrine in a democratic society. Some judges have theorized that it is necessary to protect the operations of government from undue interference and financial embarrassment. See, e.g., Larson v. Domestic & Foreign Commerce Corp., 337 U.S. ___ ____ ______ _________________________________ 682, 704 (1949); Lee, 106 U.S. at 226 (Gray, J., dissenting); The ___ ___ Siren, 74 U.S. (7 Wall.) 152, 154 (1868). Other judges, taking a _____ more positivist view of law, have suggested that the right to recover against the government cannot exist unless the government itself deigns to create such a right.7 See, e.g., Kawananakoa ___ ____ ___________ v. Polybank, 205 U.S. 349, 353 (1907). ________ Regardless of whether sovereign immunity rests on tradition, reason, or inertia, the doctrine is deeply entrenched in American law. Withal, Congress has liberally exercised its prerogative to abolish particular manifestations of the doctrine. ____________________ 7For its part, the scholarly community has been overwhelmingly hostile to the doctrine, often denouncing it as mischievous formalism, see Kenneth Culp Davis, Suing the ___ __________ Government by Falsely Pretending to Sue an Officer, 29 U. Chi. L. __________________________________________________ Rev. 435, 436-38 (1962), with little basis in English history, see Louis L. Jaffe, Suits Against Government and Officers: ___ _________________________________________ Sovereign Immunity, 77 Harv. L. Rev. 1, 2-19 (1963), and ___________________ antithetical to the democratic spirit, see John E. H. Sherry, The ___ ___ Myth that the King Can Do No Wrong, 22 Admin. L. Rev. 39, 56-57 ___________________________________ (1969). 14 See, e.g., 28 U.S.C. 1346(b), 2671-2678, 2680 (Federal Torts ___ ____ Claims Act) (subjecting the government to suit for various torts); 28 U.S.C. 1346(a), 1491 (Tucker Act) (subjecting the government to suit for damages in, inter alia, contract cases); _____ ____ see also Derfner & Wolf, supra note 6 (listing statutes waiving ___ ____ _____ governmental immunity to claims for counsel fees in various specialized contexts); cf. 18 U.S.C. 3006A (Criminal Justice ___ Act) (requiring government to pay counsel fees and other expenses on behalf of indigent criminal defendants). In considering legislation that is claimed to have the effect of waiving sovereign immunity in a particular class of cases, courts usually have been guided by two maxims. First, a waiver of sovereign immunity must be definitely and unequivocally expressed. See United States v. Mitchell, 445 U.S. 535, 538 ___ _____________ ________ (1980); In re Perry, 882 F.2d at 544. The Court has gone so far ___________ as to suggest that the unequivocal expression must appear in the text of the statute itself. See United States v. Nordic Village, ___ _____________ _______________ Inc., 112 S. Ct. 1011, 1016 (1992); Ardestani v. INS, 112 S. Ct. ____ _________ ___ 515, 520 (1991). Second, a waiver of sovereign immunity always is to be construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires. See Nordic Village, 112 S. Ct. at 1014-15; ___ _______________ Ruckelshaus, 463 U.S. at 685; In re Perry, 882 F.2d at 544. ___________ ___________ Applying these tests, several courts have held that monetary sanctions for litigation abuse are not barred by sovereign immunity in certain classes of cases on the theory that 15 an enacted statute, typically the Equal Access to Justice Act (EAJA), 28 U.S.C. 2412 (allowing prevailing parties to recover fees from the government in certain civil and administrative proceedings), serves to waive the government's immunity. See, ___ e.g., M. A. Mortensen Co. v. United States, 996 F.2d 1177, 1181- ____ ____________________ _____________ 82 (Fed. Cir. 1993) (holding that the EAJA works a waiver of immunity sufficient to allow the imposition of fees under Fed. R. Civ. P. 37); In re Good Hope Indus., Inc., 886 F.2d 480, 482 (1st ____________________________ Cir. 1989) (same, in respect to fees under 28 U.S.C. 1912 and Fed. R. App. P. 38); Adamson v. Bowen, 855 F.2d 668, 672 (10th _______ _____ Cir. 1988) (same, in respect to monetary sanction under Fed. R. Civ. P. 11); United States v. Gavilan Joint Comm'y Coll. Dist., ______________ _________________________________ 849 F.2d 1246, 1251 (9th Cir. 1988) (similar); see also Schanen ___ ____ _______ v. United States DOJ, 798 F.2d 348, 350 (9th Cir. 1985) (imposing _________________ monetary penalty against government under Fed. R. Civ. P. 60(b) without addressing sovereign immunity); United States v. National _____________ ________ Medical Enters., Inc., 792 F.2d 906, 910-11 (9th Cir. 1986) ______________________ (upholding penalty against government imposed under Fed. R. Civ. P. 37(b) without addressing sovereign immunity). Two panels in the Ninth Circuit have suggested that the Civil Rules themselves, having been authorized by Congress, may provide the basis for a waiver of sovereign immunity. See Mattingly v. United States, ___ _________ ______________ 939 F.2d 816, 818 (9th Cir. 1991) (discussing Fed. R. Civ. P. 11); Barry v. Bowen, 884 F.2d 442, 444 (9th Cir. 1989) (same).8 _____ _____ ____________________ 8At least one writer has expressed grave reservations about these decisions. See Timothy J. Simeone, Comment, Rule 11 and ___ ___________ Federal Sovereign Immunity: Respecting the Explicit Waiver _________________________________________________________________ 16 At the same time, monetary penalties under court rules have been found to be barred by sovereign immunity in other contexts. See, e.g., United States v. Woodley, 9 F.3d 774, 781- ___ ____ _____________ _______ 82 (9th Cir. 1993) (holding that neither a local rule nor Fed. R. Crim. P. 16(d)(2) works a waiver). And, moreover, even though a federal statute, 18 U.S.C. 401, confers broad powers upon federal district courts to punish contumacious conduct,9 most courts continue to hold that sovereign immunity bars court- imposed fines for contempt against the government. See Coleman ___ _______ v. Espy, 986 F.2d 1184, 1191-92 (8th Cir. 1993) (holding that ____ compensatory contempt sanctions are barred by sovereign immunity); Barry, 884 F.2d at 444 (holding that coercive contempt _____ sanctions are barred by sovereign immunity); see also McBride v. ___ ____ _______ Coleman, 955 F.2d 571, 576-77 (8th Cir. 1992) (dictum; expressing _______ grave doubt that compensatory contempt sanctions can override ____________________ Requirement, 60 U. Chi. L. Rev. 1043, 1052-57 (1993) (criticizing ___________ cases employing the narrow and broad rationale alike as inconsistent with the Court's rigid adherence in recent years to the unequivocal expression requirement). 9The statute provides: A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command. 18 U.S.C. 401. 17 sovereign immunity). But see Armstrong v. Executive Office of ___ ___ _________ ____________________ the Pres., 821 F. Supp. 761, 773 (D.D.C. 1993) (holding, without __________ undertaking any waiver analysis, that a coercive contempt sanction is not barred by sovereign immunity). To our knowledge, no court has considered on the merits the applicability of sovereign immunity to a monetary penalty assessed under the judiciary's supervisory power in a criminal case.10 III. ANALYSIS III. ANALYSIS In this case, the doctrines of sovereign immunity and supervisory power, each formidable in its own right, are in unavoidable tension.11 Despite the fact that, in recent years, ____________________ 10Although the district court in Woodley shifted fees _______ against the government partially in reliance on its supervisory power, the Ninth Circuit overturned the fee award, reasoning on this issue that the availability of other sanctions precluded the court from unleashing its supervisory power. See Woodley, 9 F.3d ___ _______ at 781-82. The ensuing dictum to the effect that sovereign immunity does not bar fee-shifting under the supervisory power, see id. at 782, is both gratuitous and unsupported. ___ ___ Our research has also unearthed an occasional near miss. For example, in Andrulonis v. United States, 724 F. Supp. __________ _____________ 1421, 1537 (N.D.N.Y. 1989), aff'd in part, rev'd in part on other _____________________________________ grounds, 924 F.2d 1210 (2d Cir. 1991), vacated on other grounds, _______ ________________________ 112 S. Ct. 39 (1992), the court granted a motion for sanctions against the federal government made under Rule 11, 28 U.S.C. 1926, and the court's inherent powers, without specifying the source for the sanction imposed. See also United States v. ___ ____ ______________ Prince, 1994 U.S. Dist. LEXIS 2962 at *1-*4 (E.D.N.Y. 1994) ______ (withdrawing assessment of jury costs against U.S. Attorney's Office under court's supervisory power, in the face of a motion for reconsideration arguing constraints imposed by sovereign immunity). 11We see no way to avoid this tension by upholding the fee award on an alternative ground. While government counsel's disobedience and deception of the court perhaps could have been punished under the contempt statute, 18 U.S.C. 401, and the entire fiasco, if conceived as a discovery violation within the 18 the domain of sovereign immunity has tended to contract and the domain of supervisory power has tended to expand, we believe that sovereign immunity ordinarily will trump supervisory power in a head-to-head confrontation. The critical determinant is that the doctrines are of fundamentally different character: supervisory powers are discretionary and carefully circumscribed; sovereign immunity is mandatory and absolute. Consequently, whereas the former may be invoked in the absence of an applicable statute, ___ the latter must be invoked in the absence of an applicable ____ statute; and whereas the former may be tempered by a court to ___ impose certain remedial measures and to withhold others, the latter must be applied mechanically, come what may. In other ____ words, unlike the doctrine of supervisory power, the doctrine of sovereign immunity proceeds by fiat: if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity. See, e.g., Meyer, 114 S. Ct. at ___ ____ _____ ____________________ ambit of Fed. R. Crim. P. 16(b)(2), might have been punishable under the broadly worded sanction authority of Fed. R. Crim. P. 16(d)(2), these possibilities afford no hope of averting a head- on collision between judicial power and sovereign immunity. In the first place, the district court's order made it pellucid that supervisory power comprised the sole foundation on which the monetary sanction rested. See Horn, 811 F. Supp. at 753-54. We ___ ____ will not go behind such a determination and speculate what the court might (or might not) have done had it analyzed the prosecutor's misconduct under a different standard. See R.W. ___ ____ Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 19 (1st Cir. ____________ __________________ 1991). In the second place, neither section 401 nor Criminal Rule 16 offer a vehicle powerful enough to overrun sovereign immunity. See Woodley, 9 F.3d at 781-82 (holding that Fed. R. ___ _______ Crim. P. 16 does not work a waiver of sovereign immunity); Espy, ____ 986 F.2d at 1191 (holding that 18 U.S.C. 401 does not work a waiver of sovereign immunity). Thus, dressing the district court's decision in different, less confrontational garb would not sidestep the imminent doctrinal clash. 19 1000. The government tells us that this is precisely such a case: since Congress has not acted, the government's immunity to fee awards in criminal cases remains intact. At first blush, the conclusion seems sound. We are able to discern only three avenues by which appellees arguably might tip-toe around this result. We trace each of these routes. The most obvious detour around the barrier presented by sovereign immunity depends on waiver. If appellees can identify some statute or rule, and show that Congress thereby lifted the federal government's sovereign immunity in this particular context, they would have an unobstructed path. But there is no such statute or rule applicable here and appellees, to their credit, do not pretend that one exists. The second detour embodies the assumption that, in appropriate cases, the judiciary possesses the naked power to override sovereign immunity. We believe that this avenue is a dead end. One of the main purposes of sovereign immunity is to guard against judicial interference in executive functions, see ___ Larson, 337 U.S. at 704, and the notion of a judicial override ______ operating ex proprio vigore would largely frustrate this purpose. __ _______ ______ In any event, the proposed detour runs headlong into a stone wall: Congress, not the courts, is the government's authorized representative for purposes of waiving sovereign immunity. See ___ supra p.13 and cases cited; see also Hans v. Louisiana, 134 U.S. _____ ___ ____ ____ _________ 1, 21 (1890) (declaring that, because the "legislative department 20 of a State represents its polity and its will," "the legislature, and not the courts, is the judge" of when sovereign immunity ought be waived). A third possible route around the barrier is to argue that, for whatever reason, the federal government's sovereign immunity does not extend to monetary sanctions, such as punitive fee awards, levied under a court's supervisory power. It is this avenue that appellees most vigorously explore. Shorn of rhetoric, they assert three basic reasons why the shield of immunity does not cover such situations. We mull each reason in turn. 1. Reward v. Punishment. Appellees assert that, for 1. Reward v. Punishment. ____________________ purposes of sovereign immunity, the law historically has precluded fee-shifting only when it is employed as a reward to prevailing parties and not when it is employed as a punishment for litigation abuse. This foray suggests that what we have called the secondary principle of sovereign immunity the tenet holding that the government is immune to monetary penalties imposed in court cases precludes fee-shifting only when the shifted fees are intended to reward a prevailing party, and not when they are meant to reprimand a misbehaving party. Appellees starts out on solid ground in the sense that the older cases discussing the secondary principle of sovereign immunity all involved monetary awards to prevailing parties directly attributable to litigatory success. See, e.g., Fairmont ___ ____ ________ Creamery, 275 U.S. at 73-74; McLemore, 45 U.S. at 288. But those ________ ________ 21 cases were cases involving costs (or fees taxable as costs) and costs always have been awarded to prevailing parties, at least in the court's discretion.12 Because costs are invariably taxed pursuant to a statute (or a rule having statutory force) that provides for the award, the fact that they are routinely awarded against the government in civil cases (under 28 U.S.C. 2412) is of no assistance to the appellees in this case. Once we move beyond the realm of costs to attorneys' fees, appellees' argument makes very little sense. Apart from a statute or rule so providing, counsel fees cannot be shifted as a reward to a prevailing party in any case, civil or criminal, whether or not the government is the fee target. See Alyeska ___ _______ Pipeline, 421 U.S. at 247 (limning "American rule"). Taking into ________ account the ground rules of American litigation, appellees' argument must mean that sovereign immunity bars fee awards against the government only when the fees are assessed under a ____________________ 12At early common law, costs were awarded to prevailing parties as a matter of course in all cases. See Arthur L. ___ Goodhart, Costs, 38 Yale L.J. 849, 851-53 (1929). Before the _____ adoption of the Civil Rules, costs were generally awarded to prevailing parties as a matter of right in actions at law, and at the judge's discretion on the equity side. See Ex parte ___ _________ Peterson, 253 U.S. 300, 317-18 (1920). In modern practice, costs ________ are commonly taxed against non-prevailing parties in civil cases, see Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S. 437, ___ _____________________ ____________________ 441 (1987); In re Two Appeals Arising out of the San Juan Dupont _____________________________________________________ Plaza Hotel Fire Litig., 994 F.2d 956, 962-64 (1st Cir. 1993); ________________________ see also Fed. R. Civ. P. 54(d), although the judge retains some ___ ____ discretion, see In re Two Appeals, 994 F.2d at 962. ___ ______________________ Theoretically, costs are similarly taxable against convicted defendants in criminal cases, see 28 U.S.C. 1918(b), although ___ the actuality is seldom seen. The statute listing categories of costs generally available, 28 U.S.C. 1920, applies to both civil and criminal cases. See United States v. Procario, 361 ___ _____________ ________ F.2d 683, 684 (2d Cir. 1966) (per curiam). 22 fee-shifting statute or rule. But the case law is arrayed against appellees' position, for the courts have never structured the secondary principle of sovereign immunity in such an odd configuration. Cf., e.g., id. at 267-68 (stating without ___ ____ ___ qualification that fee awards against the government, "if allowable at all, must be expressly provided for by statute"). What is more, a number of courts, ruling on comparable bad-faith sanctions, have either held that sovereign immunity applies, see ___ supra pp. 16-17, or taken for granted that sovereign immunity _____ would apply absent a waiver, see supra pp. 15-16.13 ___ _____ The straw that snaps the camel's back is that the appellees have offered no plausible explanation why the shield of immunity should leave the government exposed to fee awards designed as sanctions for litigation abuse, but simultaneously protect it from fees or other monetary awards routinely given to prevailing parties as virtual bonuses to reward litigatory success. The simple, unarguable fact is that any and all such fee awards would deplete the public coffers, and, consequently, ____________________ 13In this regard, fines for civil contempt under 18 U.S.C. 401, quoted supra note 9, are of special interest because _____ contempt originated as an aspect of the supervisory power, see ___ Shillitani v. United States, 384 U.S. 364, 370 (1966), and it __________ ______________ continues to serve essentially "the same purpose" as do sanctions imposed under the supervisory power in respect to litigants' and lawyers' bad-faith tactics, Chambers, 501 U.S. at 53 (citation ________ omitted). The better reasoned decisions hold that, when the two doctrines lock horns, contempt is barred by sovereign immunity. See supra p. 17. Although these decisions have little bearing ___ _____ here because they turn, explicitly or implicitly, on statutory interpretation, they do show that the principle of immunity to monetary damages is understood by thoughtful courts to sweep broadly. 23 they all must stand on the same footing vis-a-vis principles of sovereign immunity. It follows inexorably that, absent a statute or rule effectuating a waiver, the secondary principle of sovereign immunity bars fee-shifting awards against the government, whatever their intended purpose. 2. The Eleventh Amendment Analogy. It is "settled 2. The Eleventh Amendment Analogy. ________________________________ that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment." Missouri v. Jenkins, 491 U.S. 274, 279 (1989); see also Fortin v. ________ _______ ___ ____ ______ Commissioner, 692 F.2d 790, 797-98 (1st Cir. 1982) (holding, on ____________ same theory, that avoidable fines for contempt against the State are not barred by the Eleventh Amendment). Appellees urge us to extend this exception to the law of federal sovereign immunity. Although this idea is not original, see McBride, 955 F.2d at 582 ___ _______ (Lay, C.J., concurring and dissenting) (making similar suggestion), embracing it would entail a leap of faith that we are unwilling to take. The Eleventh Amendment focuses exclusively on an immunity shared by the several States. See U.S. Const. amend. ___ 11; see also Hans, 134 U.S. at 10-11 (explicating text of ___ ____ ____ Eleventh Amendment). Freely transposing Eleventh Amendment exceptions to the precincts patrolled by principles of federal sovereign immunity would create a dysfunctional jurisprudential motley and, moreover, would constitute an impermissible deviation from a course previously charted by the Court. Jenkins, the very _______ case bruited by appellees, definitively rejects the argument they 24 advance. There, the Court explained that, had the controversy "dealt with the sovereign immunity of the Federal Government," then in such event there would have been "no prospective- retrospective distinction as there is when . . . it is the Eleventh Amendment immunity of a State that is at issue." Jenkins, 491 U.S. at 282 n.4; see also In re Shafer, 146 B.R. _______ ___ ____ ____________ 477, 480 n.6 (D. Kan. 1992) (echoing Jenkins footnote). _______ 3. Separation of Powers. Appellees' final contention 3. Separation of Powers. _____________________ is that stripping away the power to assess monetary penalties in criminal cases would leave courts defenseless against litigation abuses committed by the government which is, after all, a party to every criminal case in the federal system and thereby would offend the separation of powers. See McBride, 955 F.2d at 582 ___ _______ (Lay, C.J., concurring and dissenting) (developing similar thesis); cf. Chilcutt v. United States, 4 F.3d 1313, 1327 (5th ___ ________ ______________ Cir. 1993) (making comparable suggestion in significantly different context; upholding monetary sanction levied against federal prosecutor personally). This contention seriously overstates the case, and, in all events, asks us to do Congress's work. The fact that sovereign immunity forecloses the imposition of monetary sanctions against the federal government in criminal cases does not leave federal courts at the mercy of cantankerous prosecutors. Courts have many other weapons in their armamentarium. This case aptly illustrates the point. The district judge ordered, among other things, the removal and 25 quarantine of the lead prosecutor, the suppression of tainted documents, and the advance disclosure of the government's trial strategy. In addition, the judge could have ordered the lead prosecutor to pay the accumulated fees, see Chilcutt, 4 F.3d at ___ ________ 1319 (upholding order that government counsel pay, inter alia, _____ ____ for time spent by defense counsel at contempt hearing, without being reimbursed); United States v. Sumitomo Marine & Fire Ins. _____________ ____________________________ Co., 617 F.2d 1365, 1370-71 (9th Cir. 1980) (upholding imposition ___ of monetary sanction for discovery abuse against government attorney as the "only available target for such sanctions"), but did not see fit to do so.14 He also could have ordered the prosecutor to attend ethics seminars at her own expense, see ___ Chilcutt, 4 F.3d at 1319, dispatched her to the Justice ________ Department's internal disciplinary office, see Hasting, 461 U.S. ___ _______ at 506 n.5, or publicly reprimanded the Justice Department itself, see United States v. Prince, 1994 U.S. Dist. LEXIS 2962 ___ _____________ ______ at *1-*4 (E.D.N.Y. 1994).15 While this list is not exhaustive, we are confident that it shows beyond serious question that the court had ample means at its disposal, even without fee-shifting, ____________________ 14There would seem to be no sovereign immunity bar to imposing a monetary penalty as a sanction against a rogue attorney merely because she happens to represent the federal government. See Larson, 337 U.S. at 693 (noting that sovereign ___ ______ immunity does not protect federal officials in the performance of acts that are unconstitutional or beyond their statutory authority); see also Chilcutt, 4 F.3d at 1327; Sumitomo Marine, ___ ____ ________ ________________ 617 F.2d at 1370-71. 15Although the district court eschewed these additional remedies, the Justice Department later engaged its internal disciplinary mechanism on its own initiative. 26 to catch the Justice Department's attention, punish the culprit, and deter future prosecutorial excesses. Of course, there is a more broadly focused reason why the separation-of-powers argument will not wash. While sovereign immunity may marginally limit the courts' ability to function, there is nothing sacrosanct about the courts' power to impose sanctions. Congress has wide-ranging authority to limit supervisory powers generally. See Chambers, 501 U.S. at 47. ___ ________ This includes the authority to place restrictions on courts' inherent power to shift fees. See Alyeska, 421 U.S. at 259 ___ _______ (recognizing "inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress"). It also includes the authority to regulate the courts' inherent power in respect to contempt. See 18 U.S.C. 401, quoted supra ___ _____ note 9. Circumscription of the fee-shifting power by the application of an ancient (but still viable) common law doctrine, subject to waiver through congressional action, comprises no greater insult to the independence of the Judicial Branch. Our last response to appellees' separation-of-powers argument is to note its indeterminacy. The same argument could be, and has been, turned 180 degrees. At least one highly respected scholar maintains that sovereign immunity "furthers the ________ separation of powers by limiting judicial oversight of executive conduct . . . [and thus] avoid[ing] situations where the courts will impose orders on the other branches of government that might be disregarded." Erwin Chemirinsky, Federal Jurisdiction _____________________ 27 9.2.1, at 545-46 (2d ed. 1994) (emphasis supplied). We will not paint the lily. Neither policy nor precedent supports the proposition that the separation of powers requires taking the quantum leap essayed by the court below. Leaving monetary imposts to one side, the range and reach of other sanctions, remedial and punitive, that are available to federal criminal courts permit those courts to administer their dockets and conduct judicial business with a sufficiently free hand. Courts, like litigants, must abide by certain rules and to the extent that sovereign immunity curbs judicial power, the restraint is tolerable in the constitutional sense. In the last analysis, then, appellees' contention that criminal courts are left impotent if they are deprived of the power to shift fees as a sanction against the government is as empty as a mendicant's purse. To summarize, none of the various possible detours manage to bypass the barrier of sovereign immunity. We hold, therefore, that fee-shifting against the government can be accomplished only in conjunction with the passage of a statute (or a sufficiently explicit rule having the force of a statute) that authorizes such an award. In the absence of such an enactment, the secondary principle of sovereign immunity saves the federal government harmless from all court-imposed monetary assessments, regardless of their timing and purpose. IV. APPELLATE JURISDICTION IV. APPELLATE JURISDICTION We have one more bridge to cross. It is hornbook law 28 that a court cannot act in the absence of subject matter jurisdiction; and that, when such jurisdiction is lacking, a court is obliged to note the defect on its own initiative. See ___ United States v. Pierro, ___ F.3d ___, ___ (1st Cir. 1994) [No. _____________ ______ 93-1313, slip op. at 13-14]; In re Recticel Foam Corp., 859 F.2d __________________________ 1000, 1002 (1st Cir. 1988); see also American Policyholders Ins. ___ ____ ___________________________ Co. v. Nyacol Prods., Inc., 989 F.2d 1256, 1258 (1st Cir. 1993). ___ ___________________ Thus, even though the appellees have not questioned the existence of appellate jurisdiction, we must pursue the point. Parties cannot confer subject matter jurisdiction on either a trial or an appellate court by indolence, oversight, acquiescence, or consent. A. Appeal as of Right. A. Appeal as of Right. __________________ The Appellate Rules require that an appellant's brief contain "a statement of the basis for jurisdiction in the court of appeals . . . with reference to the applicable facts to establish such jurisdiction." Fed. R. App. P. 28(a)(2)(ii). Complying, perhaps, with the letter of the rule, but not with its spirit, the government's brief states in a purely conclusory fashion only that its appeal is authorized under 28 U.S.C. 1291 (1988).16 Despite this blithe assurance, the government's entitlement to an appeal as of right under section 1291 is problematic. We explain briefly. ____________________ 16The statute provides in pertinent part, with exceptions not relevant here, that "the courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ." 28 U.S.C. 1291. 29 An appeal by the government in a criminal case must be specifically authorized by statute. See United States v. Sanges, ___ _____________ ______ 144 U.S. 310, 312 (1892). The appeal before us does not fit neatly into the confines of 18 U.S.C. 3731 (affording the United States a right of appeal from certain described orders in criminal cases, e.g., orders dismissing indictments, suppressing ____ evidence, or mandating the return of seized property), or any more specialized statute conferring a right of appeal on the government in criminal cases, e.g., 18 U.S.C. 3742(b) ____ (permitting the United States to appeal from certain sentencing determinations). And it is settled that, at least in the absence of very special circumstances, the general authorization contained in section 1291 is not sufficiently specific to authorize an appeal by the government in a criminal case. See, ___ e.g., Arizona v. Manypenny, 451 U.S. 232, 246-47 (1981) (citing ____ _______ _________ cases); United States v. Patterson, 882 F.2d 595, 599 (1st Cir. _____________ _________ 1989), cert. denied, 493 U.S. 1027 (1990). _____ ______ Notwithstanding this looming obstacle to appellate jurisdiction under section 1291, we believe that this case involves a sufficiently special set of circumstances to engage the exception rather than the rule. Some courts have suggested that, under what we choose to call the "special circumstance" exception, a government appeal may be entertained in a criminal case on the authority of section 1291 if the appeal satisfies the conditions of the so-called collateral order doctrine. See, ___ e.g., Carroll v. United States, 354 U.S. 394, 403 (1957) ____ _______ ______________ 30 (dictum); Patterson, 882 F.2d at 599; United States v. Powers, _________ _____________ ______ 622 F.2d 317, 319-20 n.2 (8th Cir.), cert. denied, 449 U.S. 837 _____ ______ (1980). Application of the collateral order doctrine is "limited to orders that (1) conclusively determine (2) important legal questions which are (3) completely separate from the merits of the underlying action and are (4) effectively unreviewable on appeal from a final judgment." Doughty v. Underwriters at _______ ________________ Lloyd's, London, 6 F.3d 856, 862 (1st Cir. 1993); see also Cohen _______________ ___ ____ _____ v. Beneficial Loan Corp., 337 U.S. 541, 546 (1949) (originating ______________________ doctrine). We think that these conditions are met in this case. Moreover, the particular circumstances at hand, especially the procedural posture in which this appeal arises and the nature of the relief sought, are conducive to allowing the appeal to go forward. In criminal cases, the policy against permitting appeals to be taken too freely is heightened by speedy trial and double jeopardy concerns. See Will v. United States, ___ ____ _____________ 389 U.S. 90, 96 (1967); DiBella v. United States, 369 U.S. 121, _______ _____________ 126 (1962). Here, those concerns do not come into play at all: the determination of the defendants' guilt has been made, sentence has been imposed, the attempted appeal is not interlocutory in any sense, and no prospect of piecemeal litigation endures. We conclude, therefore, that we have jurisdiction over the instant appeal under 28 U.S.C. 1291. We emphasize, however, that our holding is a narrow one. Rather than importing the collateral order doctrine lock, stock, and barrel into our 31 criminal jurisprudence, we hold only that when, as now, the conditions of the collateral order doctrine are satisfied,17 and the prudential concerns that traditionally militate against allowing the government to appeal in a criminal case favor, or are at least neutral in respect to, the availability of a government appeal, then section 1291 affords a vehicle through which the government may seek appellate review in a criminal case. B. Mandamus. B. Mandamus. ________ We are fortified in our resolve to hear and determine this appeal by the knowledge that, even if no appeal lies as of right, we possess and can appropriately exercise the power of discretionary review, via mandamus,18 to address the important question raised in this case. ____________________ 17We are not the first court to deem an assessment against the government qua prosecutor to be a collateral order for ___ jurisdictional purposes. See United States v. Baker, 603 F.2d ___ _____________ _____ 759, 761-62 (9th Cir. 1979) (per curiam) (entertaining government appeal, under section 1291, from district court's Rule 15(c) assessment against government of deposition-related attorneys' fees); United States v. Rogalsky, 575 F.2d 457, 459 (3d Cir. _____________ ________ 1978) (entertaining government appeal, under section 1291, from district court's assessment against government of costs arising from psychiatric examination of indigent defendant, see 18 U.S.C. ___ 3006A); but see In re Attorney General, 596 F.2d 58, 61 (2d ___ ___ _______________________ Cir.) (holding that contempt fine for discovery abuse against U.S. Attorney General is not a collateral order for purposes of section 1291), cert. denied, 444 U.S. 903 (1979). _____ ______ 18Technically, this case calls for the issuance of a writ of prohibition rather than a writ of mandamus. Because prohibition is simply the obverse of mandamus the two writs derive from the same source, see 28 U.S.C. 1651, and incorporate the same ___ standards we often use the two terms interchangeably. See In ___ __ re Pearson, 990 F.2d 653, 656 (1st Cir. 1993); Recticel, 859 F.2d __________ ________ at 1005 n.4. We do so here. 32 A federal court of appeals has the power to treat an attempted appeal from an unappealable (or possibly unappealable) order as a petition for a writ of mandamus or prohibition under the All-Writs Act, 28 U.S.C. 1651 (1988). See, e.g., United ___ ____ ______ States v. Sorren, 605 F.2d 1211, 1215 (1st Cir. 1979); see also ______ ______ ___ ____ United States v. Collamore, 868 F.2d 24, 27 (1st Cir. 1989) ______________ _________ (proceeding under mandamus powers where doubt existed as to propriety of asserting mandatory appellate jurisdiction). Mandamus is ordinarily appropriate in those rare cases in which the issuance (or nonissuance) of an order presents a question anent the limits of judicial power, poses some special risk of irreparable harm to the appellant, and is palpably erroneous. See In re Pearson, 900 F.2d 653, 656 & n.4 (1st Cir. 1993); ___ ______________ Recticel, 859 F.2d at 1005-06; see also Mallard v. United States ________ ___ ____ _______ _____________ Dist. Court, 490 U.S. 296, 308-09 (1989). In a still smaller ___________ class of cases, mandamus may lie even though all the usual standards are not met. See In re Arvedon, 523 F.2d 914, 915 (1st ___ _____________ Cir. 1975); In re Ellsberg, 446 F.2d 954, 956-57 (1st Cir. 1971); ______________ see generally 16 Charles A. Wright et al., Federal Practice and ___ _________ _____________________ Procedure 3934 (1977 & Supp. 1994). This tiny class of cases _________ involves what we have come to call advisory mandamus.19 ____________________ 19We think it is wise to distinguish supervisory mandamus from advisory mandamus. The former is used when an appellate court issues the writ to correct an established trial court practice that significantly distorts proper procedure. See, ___ e.g., United States v. Kane, 646 F.2d 4, 9 n.7 (1st Cir. 1981); ____ _____________ ____ Grinnell Corp. v. Hackett, 519 F.2d 595, 599 (1st Cir.), cert. _______________ _______ _____ denied, 423 U.S. 1033 (1975); see also La Buy v. Howes Leather ______ ___ ____ ______ _____________ Co., 352 U.S. 249, 256-60 (1957). This differs from advisory ___ mandamus in that, far from being novel, the problem sparking 33 Advisory mandamus has its roots in the Court's reference to mandamus review of "basic, undecided question[s]." Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964). It is ____________ ______ appropriate when the issue presented is novel, of great public importance, and likely to recur. See In re Justices of Supreme ___ __________________________ Court of Puerto Rico, 695 F.2d 17, 25 (1st Cir. 1982). Advisory ____________________ mandamus is not meant to allow review of "interstitial matters of case administration," Recticel, 859 F.2d at 1006, or to ________ circumvent limits on appellate review of discretionary interlocutory rulings, see Sorren, 605 F.2d at 1216. Rather, ___ ______ advisory mandamus is reserved for big game. It "should primarily be employed to address questions `likely of significant repetition prior to effective review,' so that our opinion would assist other jurists, parties, or lawyers." In re Bushkin ______________ Assocs., Inc., 864 F.2d 241, 247 (1st Cir. 1989) (citation ______________ omitted).20 ____________________ supervisory mandamus has by definition manifested itself on many occasions. 20Because situations that properly call for the use of advisory mandamus "are hen's-teeth rare," In re Bushkin, 864 F.2d _____________ at 247, relatively few prototypes exist. This is not to say that the writ has fallen into desuetude. See, e.g., In re Globe ___ ____ ____________ Newspaper Co., 920 F.2d 88, 90 (1st Cir. 1990) (issuing writ of _____________ mandamus directing district court to grant members of press access to jury list, on theory that issue presented was "sufficiently novel and important" to warrant review); In re ______ Justices, 695 F.2d at 25 (indicating that advisory writ of ________ prohibition is an appropriate means by which to direct district court not to hear facial challenges to rules governing bar membership and dues); see also Nasuti v. Scannell, 906 F.2d 802, ___ ____ ______ ________ 811 n.15 (1st Cir. 1990) (suggesting advisory mandamus would be appropriate to clarify status of federal employee immunity under amendments to Federal Tort Claims Act). 34 If no right of appeal were to exist, the case before us today would be a prime candidate for advisory mandamus. The issue presented has never before been squarely decided; yet, it is likely to recur, given the pervasiveness of litigation abuse in modern practice. There is a sufficient showing of irreparable harm in the sense that, were no court to entertain either an appeal or a petition for mandamus, the matter might perpetually evade review. Finally, the issue bears importantly on the relationship between the Judicial Branch and the Executive Branch. We regard the case for mandamus here as especially compelling because it is important in the right way. It poses an elemental question of judicial authority involving precisely the sort of "Article III-type jurisdictional considerations" that traditionally have triggered mandamus review. In re Justices, _______________ 695 F.2d at 25; see also In re Pearson, 990 F.2d at 656 (noting ___ ____ ______________ that mandamus historically has been used to check judicial usurpation of power); In re Attorney General, 596 F.2d 58, 64 (2d ______________________ Cir.) (granting mandamus relief due in part to "separation of powers overtones"), cert. denied, 444 U.S. 903 (1979). _____ ______ In short, we believe that this attempted appeal, if not entertainable as of right under 28 U.S.C. 1291, would present a classic case for the granting of advisory mandamus. Either way, the government is entitled to the relief that it seeks. V. CONCLUSION V. CONCLUSION Having satisfied ourselves that appellate jurisdiction 35 inheres, we now recapitulate. We agree with the lower court that the government committed egregious acts of prosecutorial misconduct. We do not believe, however, that the court had the right to ignore sovereign immunity in responding to that misconduct. The court's supervisory power, although potent, cannot intrude, unaided, into the sovereign's protected preserves. We need go no further. Because principles of sovereign immunity bar a federal court from invoking its supervisory power to compel the federal government to pay attorneys' fees and costs as a sanction for prosecutorial misconduct in a criminal case, we reverse the orders of the district court insofar as they purport to shift such fees and costs. All parties shall bear their own costs in this court. Reversed. No costs. ________ ________ 36