**In re CALORE EXPRESS COMPANY, INC., Debtor.**

**Henry J. Riordan, Trial Attorney, U.S. Dept. of Justice, Tax Division.**

No. CIV. A. 96–12212–RGS.

United States District Court,
D. Massachusetts.

Feb. 24, 1998.

Harold B. Murphy, Hanify & King, P.C., Boston, MA, Peter Sklarew, United States Trustee Office, Thomas P. O'Neill Jr., Boston, MA, for Debtor.

Joel B. Rosenthal, Shapiro, Israel & Weiner, P.C., Boston, MA, for Fleet National Bank.

Peter Sklaren, U.S. Department of Justice, Tax Division, Washington, DC, for Petitioner.

### MEMORANDUM AND ORDER ON PETITION FOR WRIT OF MANDAMUS

STEARNS, District Judge.

Henry Riordan, a trial attorney with the United States Department of Justice, brought this petition for a writ of mandamus seeking to expunge or correct what he char-

acterizes as a "finding" of unprofessional conduct on his part by the United States Bankruptcy Court. During a hearing which Riordan did not attend. Bankruptcy Judge William Hillman orally criticized Riordan's conduct in a bankruptcy proceeding before Judge Joan Feeney. In a written decision (later published), Judge Feeney described Judge Hillman's reproval as a "ruling" that Riordan had behaved unethically. Riordan protests that he was adjudicated guilty of misconduct "in absentia, without notice, without the chance to retain counsel, without the opportunity to present or cross-examine witnesses, and without the chance even to submit argument." Petition, at 1.

Riordan asks that this court issue a provisional writ directing the Bankruptcy Court to vacate its "improper and erroneous determination," or alternatively, that the court order the withdrawal of Judge Feeney's decision from publication until resolution of the underlying appeal taken by the United States.[1] Petition, at 50. Riordan asserts that the Bankruptcy Court's determination was unnecessary, in excess of the court's jurisdiction, erroneous, and likely to cause irreparable harm to his reputation. Petition, at 2. Respondent Fleet National Bank ("Fleet") opposes the writ, describing as "frivolous" Riordan's assertion that he was denied due process, and arguing that the determination of misconduct by the Bankruptcy Court was not "palpably" erroneous. Fleet also urges that the court postpone any decision on Riordan's petition until the underlying bankruptcy appeal is resolved.[2]

### FACTS

The relevant undisputed facts are as follows.[3] On June 12, 1996, the Internal Revenue Service ("IRS"), as part of debtor Calore Express Company, Inc.'s ("Calore") Chapter 11 bankruptcy proceeding, filed a postpetition "Request for Payment of Internal Revenue Taxes" for 1995 FICA and FUTA taxes in the amount of $239,581.83 (including penalties and interest).[4] The following day, Fleet, Calore's major lender, filed an emergency motion seeking relief from the automatic stay (the "Lift Stay Motion"). At a June 17 hearing on the motion, Judge Feeney agreed with Fleet that a prompt liquidation of Calore's assets would maximize the amount realized by its creditors. Attorney Riordan was present at the hearing but did not voice an objection to, or make any comment on, Fleet's motion.[5] Judge Feeney granted Fleet's Lift Stay Motion and made the following findings.

(1) Notice given is sufficient under the circumstances.

(2) A reorganization of the Debtor is improbable and no equity exists in Debtor's assets pledged to Fleet National Bank ("Fleet").

(3) There is no way to provide adequate protection to Fleet.

(4) Fleet is owed in excess of Two Million Eight Hundred Thousand ($2,800,000.00) Dollars by the Debtor, which obligations are secured by *inter alia* by valid, perfected first security interests in all of the Debtor's accounts, inventory and most other business assets except specific pieces of equipment in which Fleet holds liens pursuant to Court Order subject to valid, perfected pre-petition security interests.

(5) Fleet and the estate will most likely incur significant unrecoverable expenses

---

1. This latter avenue of relief is moot, the court previously having refused to enjoin publication of Judge Feeney's decision. See *In re Calore Express Co., Inc.*, 199 B.R. 424 (Bankr.D.Mass. 1996).

2. Fleet points out that several of Riordan's mandamus theories, including the assertion that in the absence of prejudice to Fleet, the "harmless error" rule places his conduct outside the jurisdiction of the Bankruptcy Court, implicate the merits of Judge Feeney's decision.

3. The proceedings before the Bankruptcy Court are more fully recounted in Judge Feeney's Memorandum of Decision.

4. The IRS had earlier filed prepetition claims totaling $3,252,222.36.

5. Riordan states that the IRS was only tangentially involved in the bankruptcy proceeding, and that as a result he attended only three of twenty-six related hearings. Petition, at 11 n. 13. He did, however, as an attorney of record, receive copies of all pleadings and orders filed in the case.

unless a prompt liquidation of the assets pledged to Fleet takes place.

Fleet National Bank ... [is] ... relieved of all stays imposed by the Bankruptcy Code including, but not limited to, that imposed by Section 362, and is authorized to collect or sell any accounts of Debtor, and exercise all of its rights and remedies in connection with the Debtor's accounts, inventory, machinery, equipment, furniture and fixtures, all in accordance with its Security Agreements and the Uniform Commercial Code by either public or private sale. Debtor shall deliver possession to Fleet upon Fleet's request.

At the hearing, Fleet's counsel also presented a Notice of Extension of Use of Cash Collateral and Borrowing Stipulation, explaining to Judge Feeney that Fleet had agreed to allow Calore to continue borrowing through July 16, 1996, against a previously authorized line of credit, for among other purposes, to maximize the collection of outstanding accounts receivable.[6] The court approved the Borrowing Stipulation. Again Attorney Riordan did not comment on, object to, take an appeal or ask Judge Feeney to reconsider her decision.

On June 13, 1996, four days prior to the hearing before Judge Feeney, the Chief of the Civil Trial Section of the Tax Division of the Department of Justice ("DOJ") signed a letter drafted by Riordan and addressed to the Chief of the Collection Branch of the General Services Administration ("GSA").

> This will confirm your discussion on this date with Attorney Henry J. Riordan of this office and Susan Pos[t]wistilo of the Boston United States Attorney's office during which you were instructed to hold all payments being made to the debtor Calore Express Company, Inc. d/b/a Ca-

lore Freight Systems. The debtor owes the United States at least $239,581.83 for post-petition federal tax liabilities (liabilities that accrued after May 11, 1995).

The Tax Division instructed GSA:

> "to hold all payments being made to the debtor Calore Express Company, Inc., d/b/a Calore Freight Systems.... At this time, do not send any payments to the Internal Revenue Service, or make any offsets. We will ask the United States Bankruptcy Court for permission to effectuate an offset if you accumulate any payments."

*In re Calore Express*, 199 B.R. at 429–430. Copies of the June 13, 1996 letter were sent to the United States Attorney for Massachusetts and to Gerald J. O'Toole, the Boston District Counsel to the IRS. Counsel for Fleet and Calore were not informed of the letter.

On June 30, 1996, Calore requested an emergency hearing, claiming that the IRS had violated the automatic stay of 11 U.S.C. § 362(a)(4). In Judge Feeney's absence, the motion was referred to Judge Hillman. At a July 2 hearing, Calore's counsel argued that neither it nor Fleet had been given notice of the instruction to GSA to withhold all money that it owed to Calore.[7] Pointing to the fact that Riordan had represented the IRS at the June 17, 1996 hearing on the Lift Stay Motion and had not disclosed the "freeze," Calore urged that the court to "sanction this type of conduct." R–148, at 5.[8]

The IRS argued that its actions were sanctioned by the decision of the Supreme Court in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). In *Strumpf*, the Court held that a bank's placing of a debtor's account on "ad-

---

6. Riordan represents that he had no involvement with or direct knowledge of the Borrowing Stipulation. "He became tangentially aware that there had been a post-petition financing arrangement when stipulations continuing the arrangement were very briefly mentioned at the end of each of the three hearings he attended." Petition, at 11.

7. Calore's counsel represented that Calore did not become aware of GSA's freeze on its accounts receivable until June 27, 1996, when

"only by virtue of one of our drivers going to pick up some receivables money due did we ever learn of this. Someone came out and said, 'No we're not paying you. We've been told not to pay you.'" R–148, at 4–5.

8. Riordan received notice that his alleged misconduct was the focus of the motion. Fleet's Opposition Memorandum, at 9. Riordan nonetheless left on vacation and did not attend the hearing. The United States was represented by another DOJ trial attorney.

ministrative hold" while it sought relief from an automatic stay order was not an exercise of a setoff right in violation of the stay. *Id.,* at 18–19, 116 S.Ct. 286. Setoff does not occur until (i) a decision to effectuate it has been made, (ii) some action accomplishing it has been taken, and (iii) a recording of the setoff has been entered. *Id.,* at 19, 116 S.Ct. 286.

Judge Hillman disagreed, stating that he viewed *Strumpf* as requiring the prompt filing of a lift stay motion, something he pointed out that the United States had not done (as of July 2, 1996).[9] The exchange with the DOJ attorney representing the IRS was as follows.[10]

THE COURT: —you don't have to tell anybody?

DOJ ATTORNEY CANNON: No, that's not it at all. We were quite clear in the letter that we sent to GSA that we were relying on *Strumpf,* that they were not to send us any money at all. Our letter to the GSA specifically said and iterated the fact that we were going to apply to the Court for permission to lift the stay and that they were not to send us any money under any circumstances until this Court acted. We're talking about the federal government and dealing with the General Services Administration—

THE COURT: Now a copy of that letter was sent to debtor's counsel at the time it went out?

MR. CANNON: No. Not that I'm aware of, no.

THE COURT: Was a copy of that letter put in the court record?

MR. CANNON: No. It's—I think it's in the court record.

THE COURT: Was the information regarding the sending of that letter brought to Judge Feeney's attention-

MR. CANNON: No.

THE COURT: —when she was talking about a financing order?

MR. CANNON: Well, again, I wasn't there, but I have no information to believe that it wasn't.

THE COURT: Well, Mr. Dale [Calore's counsel] hasn't lied to me yet, and—

MR. CANNON: I'm not accusing him of lying.

THE COURT: —in any—in this or any other case, and if he says nobody was told, then I assume that Judge Feeney was not told.

MR. CANNON: I have no reason to quarrel with that.

THE COURT: Well—

MR. CANNON: But quite frankly, what we are trying to do here was to hew exactly to what the Supreme Court said that we could do.

THE COURT: Well, you didn't. I don't think you can push that case [*Strumpf*] that far. Even assuming that IRS and GSA are the same—and as I said, I haven't decided that yet—you can't do it. You did not come running in promptly. I think you tried to sandbag the debtor, and the Service succeeded.

\* \* \*

MR. ROSENTHAL: [Fleet's counsel] . . . That counsel [Attorney Riordan], by his silence, affirmatively misled Judge Feeney—

MR. CANNON: Oh, that's—

MR. ROSENTHAL: —and all the other counsel in the courtroom, and he's denying it now, but Mr. Riordan—

MR. CANNON: I'm not denying anything.

THE COURT: No.

MR. CANNON: Judge, that motion was a motion of the bank. Mr. Riordan was not before the Court on that motion on that day. That was the bank's motion to lift the stay, not ours. I guess counsel is saying that in the course of trying to determine whether or not there were any funds that were going to be—we were going to try to freeze that we had to get

---

**9.** The United States filed the motion on July 15, 1996.

**10.** The ensuing colloquies include all of Judge Hillman's references to Attorney Riordan.

his permission to do it, I guess. Maybe—perhaps that's what he's saying.

THE COURT: No, he's not saying that. What he's saying is that basic honesty when counsel appear in a courtroom and they hear the Court is discussing a motion which would affect something that has already been done by the client is, I believe that counsel has an obligation to step up, rise on his or her hind legs, and inform the Court of what's going on, because we guys don't like to do vain things. And if what you have done has made a nullity out of what she was trying to do, which was to permit a 363 sale, then you have had an ill effect on the entire process, and you're not supposed to do that.

MR. CANNON: Well, Judge, I can assure you that it was not Mr. Riordan's intent to effect a—

THE COURT: Well—

MR. CANNON: —to do that, and certainly not to cause any—

THE COURT: I'm not—I'm not big on the white heart and empty mind theory. I know that he had written a letter, the letter had a direct impact on what was going on. I believe he had an obligation to tell the Court what was going on, and he didn't do it, and that's all it is. I'm not talking about IRS fraud or anything else. Let's talk about attorney misconduct. Let's talk about violation of the automatic stay. In my ruling on *Strumpf*, I follow Judge Queenan. I always agree with Judge Queenan, but *Strumpf* has restricted the Queenan decision by saying you've got to act promptly.

\* \* \*

MR. CANNON: I would suggest that we certainly are trying to act as promptly as we can. If—had it not been that [AUSA] Ms. Pos[t]wistilo was not available yesterday, I think we could have had the motion on file as early as yesterday. We did not know. I didn't—can represent to the Court that I did not—was not first informed of the amount involved until yesterday afternoon, and that was—

THE COURT: Well, you know, the amounts don't matter.

MR. CANNON: Well, Judge—

THE COURT: They really don't matter. What we're concerned with is that a whole bunch of people sat in the courtroom and tried to work out a deal and permit a 363 sale and IRS sat there knowing it had stopped a source of income—

MR. CANNON: Mr. Riordan—Judge—if I could—

THE COURT: He wrote the letter, didn't he?

MR. CANNON: Yeah, but he did not—he knew that he sent the letter—

THE COURT: He didn't read the letter he wrote?

MR. CANNON: —seeking an administrative freeze, but his letter, I think is quite clear—

THE COURT: Sit down, Mr. Rosenthal.

MR. CANNON: He has a—he doesn't know at that point in time—I know he understands that there's contracts with the government, but he doesn't know how many there are and where they are, and I'm quite certain he probably wasn't even aware of whether, in fact—

THE COURT: That's the most disingenuous argument I've heard in this courtroom since yesterday. He wrote the letter.

MR. CANNON: There's no question he wrote the letter.

THE COURT: It was the fact that the letter was written is the fact that should have been brought to the attention of the Court. He did not have the option of having written the letter and sit silently by. Now how am I going to undo this? How are we going to undo it? You and I. I think what you ought to do is retract the letter, and I'll order you to.

\* \* \*

THE COURT: The IRS is directed to release its instructions to GSA placing an administrative freeze on funds of the debtor. Now that's my problem solved for the day. I really don't want to start talking about long-term relief because it's not my case. So I think that will take care of our

problem for the moment, and if that is done, then we can proceed.

\* \* \*

MR. CANNON: And I will, however, say to the Court that we will obviously continue with your order; however, we may seek an immediate appeal of that order.

THE COURT: Certainly. Of course. You're entitled. There's a lot of stuff that's unsettled here, and I'm just trying to put a band-aid on this situation until Judge Feeney gets back from vacation, which is next week; so you can get fast, fast, fast relief next week. Okay, that's the order on the motion. Thank you all.

The United States did not file a motion for reconsideration (Bankr.R. 9023) or take an appeal of Judge Hillman's "determination of ethical misconduct." On July 15, 1996, the United States filed a motion seeking relief from the automatic stay in order to effect a setoff. The motion was heard by Judge Feeney on July 30, 1996.[11] Judge Feeney denied the motion in an August 21, 1996 decision in which she characterized Judge · Hillman's comments at the June 17 hearing as follows:

Judge Hillman ruled that, at the June 17, 1996 hearing, Attorney Riordan had violated his ethical obligations to the parties, in particular to Fleet, which had agreed to further lend monies to Calore secured by accounts receivable, and to the court by failing to disclose that the IRS had directed GSA to withhold payment from the Debtor on account of monies due for services rendered. Accordingly, Judge Hillman entered an order requiring the United States to release its instructions to GSA not later than July 2, 1996 at 4:00 p.m. The United States complied with the order.

---

**11.** Again Riordan failed to attend the hearing. The United States was represented by Assistant U.S. Attorney Poswistilo.

**12.** The government did not ask Judge Feeney to reconsider any part of her decision but chose to proceed directly with an appeal.

**13.** In a December 18, 1997 letter to the court, Riordan's counsel, Peter Sklarew, stated that "[the court] has already held that appeal was not a procedure available to Mr. Riordan, leaving mandamus as his only vehicle to seek review."

*In re Calore Express,* 199 B.R. at 430. On September 3, 1996, the United States appealed Judge Feeney's decision to this court.[12] On November 1, 1996, Riordan filed this petition.[13]

### DISCUSSION

 The parties recognize that mandamus is an extraordinary remedy.

[Supervisory] [m]andamus is ordinarily appropriate in those rare cases in which the issuance (or nonissuance) of an order presents a question anent the limits of judicial power, poses some special risk of irreparable harm to the appellant, and is palpably erroneous. In a still smaller class of cases, mandamus may lie even though all the usual standards are not met. This tiny class of cases involves what we have come to call advisory mandamus.

*United States v. Horn,* 29 F.3d 754, 769 (1st Cir.1994) (internal citations omitted).[14] In a footnote, the Court continued:

We think it is wise to distinguish supervisory mandamus from advisory mandamus. The former is used when an appellate court issues the writ to correct an established trial court practice that significantly distorts proper procedure. This differs from advisory mandamus in that, far from being novel, the problem sparking supervisory mandamus has by definition manifested itself on many occasions.

*Id.,* at n. 19 (internal citations omitted).

Riordan contends that supervisory mandamus is appropriate here because: (1) "no bankruptcy purpose" was served in sanctioning his conduct; (2) the harmless error rule deprived the Court of the power to adjudicate his alleged ethical misconduct absent

---

This interpretation of the court's rulings is mistaken. This court did not decide one way or another the issue of Riordan's right to appeal Judge Feeney's decision. It simply declined to consolidate Riordan's petition for a writ of mandamus with the government's earlier filed appeal of the judgment of the Bankruptcy Court.

**14.** "[O]ccasions for employing advisory mandamus are hen's teeth rare." *In re Bushkin,* 864 F.2d 241, 247 (1st Cir.1989).

evidence of actual prejudice to Fleet or Calore; and (3) the Bankruptcy Court's determination of unethical conduct was "palpably erroneous." Riordan points to a trilogy of Seventh Circuit cases acknowledging the power of a district court to issue a writ of supervisory mandamus to expunge an unflattering characterization of a lawyer from the record, although in each instance the Court of Appeals affirmed the district court's refusal to do so. Each of the petitioners in the trilogy complained that a judicial finding of unethical conduct had stigmatized his professional reputation. In *Bolte v. Home Insurance Company*, 744 F.2d 572, 573 (7th Cir. 1984), the Court held that "an attorney may not appeal from an order that finds misconduct but does not result in monetary liability, despite the potential reputational effects." Similarly, in *Clark Equipment Co. v. Lift Parts Mfg. Co.*, 972 F.2d 817, 820 (7th Cir. 1992), the Court held that a district court's finding that an attorney had engaged in grossly unprofessional conduct was not appealable because the parties had settled the case. The Court found that the attorney's argument that his reputation had been harmed was "speculative," but agreed that "mandamus might be an appropriate remedy" if he could someday demonstrate "concrete harm." *Id.* In the most recent case, *Barnhill v. United States*, 11 F.3d 1360 (7th Cir.1993), the Court reaffirmed *Clark*'s holding that speculative harm to professional reputation is not a "cognizable injury" meriting mandamus. *Id.*, at 1371. The Fifth Circuit, on the other hand, has held that a district court's finding that an attorney was "guilty of blatant misconduct" is a concrete harm to reputation sufficient to authorize an appeal. *Walker v. City of Mesquite, Texas*, 129 F.3d 831 (5th Cir.1997). Commenting directly on *Clark*'s "monetary liability" requirement, the Fifth Circuit observed:

> [s]tripped to essentials this proposition would maintain that an attorney has more of a reason and interest in appealing the

imposition of a $100 fine than appealing a finding and declaration by a court that counsel is an unprofessional lawyer prone to engage in blatant misconduct. We reject this proposition out of hand, being persuaded beyond peradventure that one's professional reputation is a lawyer's most important and valuable asset.

*Id.*, at 832.

 While I am sympathetic to Riordan's reputational concerns, it is not clear to me that Judge Hillman's comments were intended as an actual adjudication of misconduct on his part. (Judge Hillman, it is clear from the record, was speaking of the events that had occurred before Judge Feeney, and not about anything transpiring directly before him.) It is also unclear whether Judge Feeney, in her August 21 decision, was simply paraphrasing Judge Hillman's remarks or whether she intended to make an independent finding of misconduct of her own. If Judge Feeney (or Judge Hillman) in fact intended to adjudicate Riordan guilty of professional misconduct, fairness would suggest that Riordan be given the opportunity to be heard in defense or mitigation of his conduct.[15] If the Bankruptcy Court did not intend to make such a finding, it would be better if it said so explicitly. I will, in a limited exercise of mandamus, seek clarification from Judge Feeney as to whether she (or Judge Hillman) in fact intended to formally sanction Riordan.[16] If the Bankruptcy Court did intend such a sanction. I will ask that Judge Feeney permit Riordan to be heard before confirming or modifying the finding of misconduct.

### ORDER

A writ shall issue to the Bankruptcy Court consistent with the directives of this decision.

SO ORDERED.

---

**15.** I note that instead of asking Judge Feeney to reconsider her opinion and to hear his version of events, Riordan chose to come to this court with a constitutionally dubious request that it restrain publication of Judge Feeney's decision.

**16.** I assume for present purposes that Riordan has suffered a "concrete harm" to his reputation. Riordan claims that "[t]he Decision has already been brought to [my] attention by other lawyers and [I] believe it has generated considerable attention among lawyers in the Boston area." Petition, at 3 n. 3.