In re DURO INDUSTRIES,
INC., Debtor.

Duro Industries, Inc., Appellant,

v.

Official Committee of Unsecured
Creditors, Appellee.

ARK Investment Partners, II, L.P.,
ARK CLO–2000–1, Limited,
Appellants,

v.

Official Committee of Unsecured
Creditors, Appellee.

Chace Street, Inc., f/k/a Duro Industries,
Inc., ARK Investment Partners, II,
L.P., ARK CLO–2000–1, Limited,
David L. Canedo, Lawrence F. Hims,
John F. Magrue, Edward F. Ricci, An-
thony Sarno, and Kevin J. Walsh, Pe-
titioners,

v.

United States Bankruptcy Court for
the District of Massachusetts,
Respondent.

BAP Nos. MB 02–084, MB
02–085, MB 02–086.

Bankruptcy No. 02–16131–CJK.

United States Bankruptcy Appellate Panel
of the First Circuit.

May 29, 2003.

Daniel C. Cohn, Boston, MA, for Chace Street, Inc., f/k/a/ Duro Industries, Inc.

Douglas R. Gooding, Paul Bonanno, Boston, MA, for ARK Investment Partners, II, L.P., ARK CLO–2001–1, Limited.

Peter H. Sutton, Craig Ziady, Boston, MA, for Official Committee of Unsecured Creditors.

Before HAINES, CARLO and BROWN, U.S. Bankruptcy Appellate Panel Judges.

HAINES, Bankruptcy Judge.

Before us is a trio of matters. Chace Street, Inc., formerly Duro Industries, Inc. ("Duro"), appeals the bankruptcy court's memorandum of decision rendered in connection with dismissal of its Chapter 11 case, and the bankruptcy court's order refusing to reconsider and amend the memorandum. ARK Investment Partners, II, L.P., and ARK CLO–2000–1, the Debtor's pre- and post-petition lenders (whom we will refer to collectively as "ARK" or the "Lenders") appeal the same memorandum of decision, as well as denial of their own motion for reconsideration. Together with certain individual insiders of each, Duro and ARK also seek a writ of mandamus requiring the bankruptcy court to "vacate" its memorandum or, alternatively, to "expunge" from it the "determination of fraud and misrepresentation" they assert it contains. The two appeals and the mandamus petition have been consolidated for our consideration.

As explained below, we are unconvinced that the appeals bring to us matters over which we may exercise jurisdiction. Duro and ARK seek review not of the court's final order dismissing the case, which was issued with their consent, but of comments set forth in a post-dismissal memorandum and the court's refusal to reconsider the memorandum's issuance and content. And, although we may or may not have the power to issue writs of mandamus, we conclude that the reasons asserted for the writ's issuance here are inadequate. Accordingly, the appeals and the petition for the writ will be dismissed.

### Background

Duro filed a voluntary Chapter 11 petition on August 23, 2002. In a motion seeking authority to use cash collateral and obtain post-petition financing filed with the petition, Duro asserted that it owed ARK over $40 million, that ARK held a pre-petition security interest in substantially all of Duro's assets, and that the assets were worth approximately $20 million. Moreover, the motion and accompanying papers disclosed that Duro needed post-petition advances of approximately $4 million over the next 30 days and that ARK would provide those advances only if, among other things, Duro filed a motion to sell substantially all of its assets, pursuant to § 363 of the Bankruptcy Code[1] within 45 days, and completed the sale within 90 days. The papers also revealed that ARK owned 51% of Duro's stock. Although the financing motion sought to secure ARK's post-petition advances with substantially all of Duro's pre- and post-petition assets, it did not propose to encumber Duro's automobiles (which were not subject to an ARK lien at filing) or the avoidance causes of action that accrued to Duro upon its bankruptcy filing. *See, e.g.,* §§ 547(b), 548, 549.

The court heard the financing motion on August 27, 2002. Duro and ARK made it clear that a § 363 sale was the object of the Chapter 11 filing. Duro's counsel represented that his client had discussed a possible sale of assets to ARK, revealed that (apart from talking to ARK) marketing efforts had been insubstantial to date, and expressed his expectation that ARK would submit a bid for Duro's assets. ARK and Duro acknowledged the court's previously expressed unwillingness to entertain such a limited purpose Chapter 11 case absent some benefit to unsecured creditors. They thus represented they would negotiate with an unsecured credi-

---

1. Unless otherwise indicated, all references to statutory sections are to the Bankruptcy Reform Act of 1978, as amended, codified in 11 U.S.C. §§ 101, *et seq.* ("Code" or "Bankruptcy Code").

tors' committee as soon as one was formed. The court approved the financing preliminarily. Pending final approval, Duro's automobiles and avoidance actions would remain unencumbered and its ability to attempt to "surcharge" ARK's collateral via § 506(c) would remain in place.

The United States Trustee appointed an official unsecured creditors' committee (the "Committee") on September 4, 2002, and on September 10, the Committee objected to final approval of Duro's post-petition financing arrangement with ARK. It protested that the arrangement, and, indeed, the entire Chapter 11 proceeding, was calculated merely to enable ARK to avoid state law foreclosure processes by taking advantage of § 363's "free and clear" sale provisions. The Committee apprehended that Duro's assets were being freight-trained to early sale solely for ARK's benefit. In essence, it contended that Duro's reorganization was a sham, likely to benefit only ARK and its allies.

The financing motion came on for final hearing on September 13, 2002. The Committee appeared and reported that the parties had yet to negotiate terms on which it would consent to the financing and sale urged by Duro and ARK. At the court's insistence, the parties negotiated an agreement by day's end. In a nutshell, their compact provided that Duro would sell substantially all its assets via a § 363 sale; unsecured creditors would receive $1 million, plus 20% of any proceeds over $32 million; ARK would subordinate its deficiency claim; and unsecured creditors would retain their rights to avoidance litigation recoveries.

Duro, ARK, and the Committee discussed the process for marketing and selling Duro's assets. (As will be seen, questions later arose about the extent there was full disclosure, understanding, and agreement on those points.) The court entered orders approving the financing/sale arrangements and approving Duro's retention of a financial advisor (who was understood by some to have a role to play in the asset marketing process) at the close of the September 13 hearing.

On September 23, 2002, the Committee filed an emergency motion to reconsider and vacate the final financing order because it considered Duro had demonstrated "a complete failure and apparent lack of interest" in marketing its assets.[2] On September 25, the court convened a hearing. Duro's president and chief executive officer testified about his company's efforts to sell its assets. The parties bickered about what had been disclosed prior to, and what was required by, the September 13 financing order. A broader discussion ensued regarding the relative advantages and disadvantages of vacating the financing order (which the judge indicated she was ready to do) or dismissing the case outright (as the U.S. Trustee had requested in a then-pending motion). The Committee's counsel expressed a willingness to see the case dismissed, rendering the motion to vacate the financing order moot, and ARK's counsel agreed.[3] Duro did not object.

In her remarks addressing dismissal the judge commented that, notwithstanding an impending deadline for acceptance of offers to purchase Duro's assets, there had been "no real efforts" to market them and

2. *See* Emergency Motion for Reconsideration by the Official Committee of Unsecured Creditors to [sic] the Final Order Approving Use of Cash Collateral and Authorizing Post Petition Financing, Appendix Vol. II ("App.II") at 449.

3. In connection with dismissal, ARK agreed to pay post-petition administrative expenses, including quarterly fees due the U.S. Trustee, and the court reserved jurisdiction over related issues.

that Duro's financial advisor (who was hired on ARK's recommendation) had no suitable experience to assist marketing efforts. She mentioned "alleged misstatements" made about marketing at earlier hearings on the financing order, remarking that she found them "troubling," and concluded, "At this point dismissal is appropriate, so I will enter an order allowing the United States Trustee's motion to dismiss."[4] In a minute order entered on September 26, 2002, the judge reported that in the course of hearings on the emergency motion for reconsideration, the Committee's counsel had "requested that the Court rule on the prior oral motion of the U.S. Trustee to dismiss. The Court dismissed the case for the reasons stated on the record. The motion to reconsider the final order on cash collateral [and financing] is moot."[5]

No party appealed dismissal. However, on October 7, 2002, notwithstanding that (consensual) dismissal had already entered "for the reasons stated on the record," the bankruptcy judge issued an extensive memorandum setting forth " findings and rulings" relating to the case's dismissal. The coals-to-Newcastle character of the after-the-fact memorandum's issuance would have passed as the non-event it was, but for the fact that it contained multiple findings taking Duro and ARK to task for misleading the court and the Committee about the sales process in the course of obtaining the cash collateral/post-petition financing order.

Although the court's determinations on those points related more particularly to the mooted motion to vacate the financing order, as opposed to the case's dismissal, Duro and ARK took umbrage. Each by timely motion sought the memorandum's reconsideration and amendment. When, on November 4, 2002, the court denied their motions, Duro and ARK each appealed (1) the memorandum of decision and (2) the order denying reconsideration and amendment.

## Discussion

### A. The Appeals

#### 1. Jurisdiction—The Procedural Aspect

Duro's Chapter 11 case was dismissed by the court's order of September 26, 2002. The dismissal is unchallenged. The court issued its memorandum of decision on October 7, 2002. Duro and ARK filed their motions seeking reconsideration, amendment, or rescission of the memorandum on October 17, 2002. Those motions were denied on November 4, 2002. Duro and ARK filed their notices of appeal on November 15, 2002. Thus, by operation of Fed. R. Bankr.P. 8002(a) & (b),[6] the Duro and ARK appeals meet the procedural and timing requirements to place before us both the orders denying reconsideration and the memorandum of decision. But although the procedural requirements for review are met, whether the matters presented for review qualify for the exercise of appellate jurisdiction is another matter.

#### 2. Jurisdiction—The "Final Order" Problem

Our jurisdiction is established by 28 U.S.C. § 158, which confers bankruptcy

---

4. *See* Transcript of September 23, 2002, hearing at 71–72, App.II at 538–39.

5. *See* Order dated September 25, 2002, App.II at 540.

6. Briefly stated, Rule 8002(a) requires a notice of appeal to be filed within 10 days of the date the judgment, order, or decree appealed from is entered. Rule 8002(b) provides that a timely motion for relief from, or to amend the judgment extends the appeal period to 10 days after entry of the order disposing of the motion.

appellate panels with the same appellate jurisdiction as that held by the district courts. That is, we may hear appeals from (1) final judgments, orders, and decrees; (2) interlocutory orders extending or reducing the Chapter 11 exclusivity period; and (3) with "leave of court," other interlocutory orders and decrees. *See* 28 U.S.C. § 158(a) & (b); *see generally Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),* 218 B.R. 643, 646–47 (1st Cir. BAP 1998).

The appeals before us do not implicate questions of "finality," an eely notion in the bankruptcy context. *See In re Saco Local Dev. Corp.,* 711 F.2d 441, 444–46 (1st Cir.1983). No one questions that the only order, the only judicial action, associated with the appellants' grievances was the order dismissing Duro's bankruptcy case. No party appealed. Rather, Duro and ARK ask that we review the post-dismissal memorandum of decision and the court's refusal to reconsider its issuance.

### a. The Memorandum of Decision

■ The problem is obvious. Our jurisdiction extends to review of "judgments, orders, and decrees." 28 U.S.C. § 158(a). Nothing of that ilk is before us and no exception to that general principle obtains. *See In re Bank of New England Corp.,* 218 B.R. at 646–48 (extended discussion of appealability). Duro and ARK "appeal" the bankruptcy court's unflattering "findings" regarding the way they obtained the financing order.

■ "[I]t is an abecedarian rule that federal appellate courts review decisions, judgments, orders, and decrees—not opinions, factual findings, reasoning, or explanations." *Williams v. United States (In*

*re Williams),* 156 F.3d 86, 90 (1st Cir. 1998), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 905, 142 L.Ed.2d 904 (1999).[7] In *Williams,* two attorneys appealed both a bankruptcy judge's critical comments about them and the monetary sanctions he imposed against each. On reconsideration, the bankruptcy judge vacated the sanctions against one. On appeal, the district court vacated the sanctions against the other, but was satisfied that the bankruptcy judge's critical findings were well supported by the record. By the time the attorneys' appeal was before the circuit court, no sanctions remained. In the absence of sanctions, the circuit court "lack[ed] jurisdiction to consider the propriety of the offending findings." *Id.* (citing cases).

We need not dwell on this point. Were we to view *Williams* as a "close case," the case before us is much less so. The appellants in *Williams* were attorneys, over whom trial court judges have implicit disciplinary power. *See, e.g., Sheridan v. Michels (In re Disciplinary Proceedings),* 282 B.R. 79, 86 (1st Cir. BAP 2002). They argued that, monetary sanctions aside, such harsh words as were directed at them by the trial judge "besmirched" their reputations, constituting *de facto* sanctions (*i.e.,* reprimands). *In re Williams,* 156 F.3d at 91. The court rejected their argument, commenting that "any rule that purports to transform harsh judicial words into a '*de facto* sanction' will be almost impossible to cabin." *Id.*

The appellants here are corporate parties, not attorneys, not even individuals. To support appellate jurisdiction, they do not contend that sanctions, as such, were imposed. Were we to adopt the appealability approach appellants recommend,

---

7. We recognize the differences between 28 U.S.C. § 158(a), which defines our jurisdiction, and 28 U.S.C. § 191, which articulates that of the circuit court. For today's purposes, those differences are of no moment.

were "injury to reputation" the *sine qua non* of appellate jurisdiction, the final judgment rule would be out the window. There would remain "no principled basis for distinguishing between a chastised attorney and any other participant in the judicial process who becomes the target of the presiding judge's opprobrium." *Id.* Under such a regime, "[l]awyers, witnesses, victorious parties, victims, bystanders—all who might be subject to critical comments by a [trial] judge—could appeal their slight if they could show it might lead to a tangible consequence ...." *Bolte v. Home Ins. Co.,* 744 F.2d 572, 573 (7th Cir.1984).

The memorandum is not a final order—or an order of any stripe. We lack appellate jurisdiction to review its content.

### b. The Order Denying Reconsideration

▉ Because we lack appellate jurisdiction to review the memorandum of opinion, jurisdiction is similarly lacking over the order denying reconsideration of its content. The rule articulated above, withholding appellate jurisdiction over a judge's "critical comments" and "slights," would be vitiated entirely if orders denying reconsideration of such remarks were themselves invested with "final order" status. We conclude the order denying reconsideration of the memorandum of decision provides no independent basis to sustain an appeal.

### B. The Petition for Mandamus

On November 18, 2002, Duro and ARK, together with certain of their insiders

(David L. Canedo, Lawrence F. Himes, John F. Megrue, Edward F. Ricci, Anthony Samo, and Kevin J. Walsh), petitioned us to issue a writ of mandamus "directing" the bankruptcy court to "vacate" the memorandum of decision or, alternatively, to "expunge the determination of fraud and misrepresentation contained therein."

▉ A writ of mandamus is an order "directing a public official to perform a duty exacted by law." 19 James Wm. Moore *et al.,* Moore's Federal Practice § 204.01[2][c] (3d ed.1997). An order prohibiting certain judicial action is termed a writ of prohibition—the obverse of mandamus—but there is no practical distinction in procedures dealing with them in appellate tribunals. *In re Atlantic Pipe Corp.,* 304 F.3d 135, 138 n. 1 (1st Cir.2002).

▉ Mandamus can be "supervisory," "ordinarily appropriate [only] in those rare cases in which the issuance (or nonissuance) of an order presents a question anent the limits of judicial power, poses some special risk of irreparable harm to the [petitioner], and is palpably erroneous." *Id.* at 139 (quoting *United States v. Horn,* 29 F.3d 754, 769 & n. 19 (1st Cir.1994)). Mandamus also can be "advisory," employed without a showing of irreparable harm where a previously unaddressed question regarding the limits of judicial power anent a systemically important issue (one that is capable of significant repetition before other, effective review may be had) is presented. *In re Atlantic Pipe Corp.,* 304 F.3d at 140.[8]

---

**8.** *United States v. Horn* summarized the advisory/supervisory distinction:

> We think it is wise to distinguish supervisory mandamus from advisory mandamus. The former is used when an appellate court issues the writ to correct an established trial court practice that significantly dis-

torts proper procedure. This differs from advisory mandamus in that, far from being novel, the problem sparking supervisory mandamus has by definition manifested itself on many occasions.

*United States v. Horn,* 29 F.3d 754, 769 n. 19 (1st Cir.1994).

278

■ Mandamus might issue when an attorney, perhaps even a party, is wrongly calumnized by a court, but the writ's issuance in such circumstances is a rare event.[9] In such circumstances, the appellate court is exercising a brand of supervisory mandamus powers.[10] Again, such exercises are reserved for instances of unwarranted judicial excess, where the writ's invocation presents a question "anent the limits of judicial power, poses some special risk of irreparable harm, and is palpably erroneous." *In re Williams*, 156 F.3d at 93; *see also In re Calore Express Co.*, 226 B.R. 727, 733 (D.Mass. 1998) (limited exercise of the writ called for to obtain clarification from bankruptcy judge whether remarks about attorney conduct were intended to constitute formal adjudication of misconduct).

### 1. Mandamus Jurisdiction

■ The threshold question is whether we, as a bankruptcy appellate panel, have statutory jurisdiction to issue the writ. The All Writs Act, under which federal courts issue writs of mandamus, provides

that the "Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

Opposing issuance of the writ, the Committee states that bankruptcy appellate panels are established by the courts of appeals, *see* 28 U.S.C. § 158(b), rather than (directly) by congressional act. Although circuit courts act pursuant to congressional direction when they create bankruptcy appellate panels, to the Committee's mind the difference is critical. In its view a bankruptcy appellate panels lacks the congressional pedigree requisite to jurisdiction under the All Writs Act.

The Bankruptcy Appellate Panel for the Ninth Circuit addressed the question head-on in *Salter v. United States Bankr. Court for the Cent. Dist. of California (In re Salter)*, 279 B.R. 278 (9th Cir. BAP 2002), convincingly concluding that bankruptcy appellate panels may, indeed issue the writ.[11] But the issue whether bank-

9. In *In re Williams*, the court cited an Eighth Circuit case where mandamus was employed to strike a trial judge's "withering, and unjustified, condemnation" of identified corporate insiders. *In re Williams*, 156 F.3d at 93 (citing *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1188 n. 11, 1190–94 (8th Cir.1984)). The case was cited for the proposition that an *attorney* might seek mandamus as a remedy for unwarranted criticism from the public record. We are unaware of any instance in which the First Circuit has issued mandamus at the behest of an aggrieved, lay individual as the Eighth Circuit did in *Gardiner*.

10. We conclude that such mandamus as may issue to correct an unwarranted reprimand or the like is a brand of supervisory mandamus, although it lacks the characteristic of "manifest[ing] itself on many occasions" described in *United States v. Horn*. We do so because on the occasions where its use in connection with such problems has been discussed, the courts have reliably referred to "irreparable

harm," "limits of judicial power," and "palpable erroneousness." *See, e.g., In re Williams*, 156 F.3d at 93; *United States v. Horn*, 29 F.3d at 769; *In re Calore Express Co.*, 226 B.R. 727, 732–33 (D.Mass.1998). Advisory mandamus is apt to address "systemically important" issues, where irreparable harm may likely not be an issue. *See In re Atlantic Pipe Corp.*, 304 F.3d at 140 (addressing district court's power to mandate mediation).

11. It could be argued that [28 U.S.C.] § 1651(a) does not authorize the BAP to issue a writ of mandamus, because the BAP was "established" by the Ninth Circuit Judicial Council, not by Congress. We conclude, however, that such a narrow reading of "established by Act of Congress" is inconsistent with the purpose and function of the All Writs Act, and that [by virtue of 28 U.S.C. § 158] BAPs are "established by Act of Congress" as used in § 1651(a).

ruptcy appellate panels have jurisdiction to issue mandamus has received no attention from the courts of appeal. *Salter* aside, there are no footprints in the field. To answer the question, we would prefer to traverse more well trod ground. Awaiting that day, however, we are readily able to resolve the case before us. Because we easily conclude that the petitioners have failed to demonstrate the necessary prerequisites for mandamus to issue, we will reserve the question of our mandamus jurisdiction and proceed directly to the merits. *Restoration Preservation Masonry, Inc. v. Grove Europe Ltd.*, 325 F.3d 54, 59 (1st Cir.2003) (collecting cases and distinguishing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); reaffirming that matters of *statutory* jurisdiction may be reserved where the merits can be readily resolved in favor of the same party).

## 2. Merits of Mandamus

■ For the writ to issue, petitioners must demonstrate: a question anent the limits of judicial power, a special risk of irreparable harm, and judicial action that is "palpably erroneous." *United States v. Horn*, 29 F.3d at 769. Although there is much to be said (and the parties have said much) on the question whether the bankruptcy judge's "findings" were in error,[12] it is plain that, as explained above, such errors as may exist attend no judicial "act." Moreover, the petitioners cannot demonstrate that failure to issue mandamus presents for them a "special risk of irreparable harm."

### a. What the Memorandum Said

The court's October 7, 2002, memorandum runs fourteen pages in length.[13] Well more than half of it is introduction and background. Quoting passages of transcript, the judge points out that during the course of hearings on financing arrangements Duro's counsel and ARK's counsel made "directly conflicting" statements about the extent of pre-bankruptcy marketing. The memorandum explains generally what the court's and the Committee's concerns were regarding post-petition financing, the sale process, the relation between Duro and ARK, and the negotiated resolution of those concerns. It outlines the Committee's motion to vacate the September 13, 2002, order addressing financing, cash collateral, and sale based on the Committee's view that the financing order had been obtained "under false pretenses" and with "false representations." The judge relates her conclusions that Duro's marketing efforts were "inadequate" to warrant a bankruptcy sale and that those efforts "were not consistent with" the promise Duro and ARK made to the Committee to provide it a share of sales proceeds exceeding $32 million.

Although less than explicitly, the memorandum treated the Committee's motion for reconsideration as, *inter alia*, a motion for relief from the financing order under

. . . .
... Congress "conceived" the BAPs, provided the authority for their creation, prescribed their appellate functions and jurisdiction, and directed the circuits' judicial councils to establish the BAPs to carry out those functions.... Because Congress authorizes the establishment of BAPs and defines their authority, we conclude that a BAP is a court established by act of Congress.

*In re Salter,* 279 B.R. at 281, 283.

**12.** The petitioners complain not only that the court's "findings" were erroneous, but also that, because the Committee's motion was heard on an emergency basis with one day's notice, they were deprived of procedural due process in the bargain.

**13.** The memorandum opinion is found at App.II pp. 541–554.

Fed. R. Bankr.P. 9024, which incorporates substantially all Fed.R.Civ.P. 60, including Rule 60(b)(3) (providing that the court may relieve a party from a final judgment or order if it was the product of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party"). Without reference to Rule 60(b)(3)'s clear and convincing standard of proof, *see Tiller v. Baghdady,* 294 F.3d 277, 282 (1st Cir. 2002), the judge stated: "On the basis of the evidence produced at the [September 25, 2002] hearing, the Court concluded that the Committee had sustained its burden of proof. [Duro] and [ARK] had not, at any time in the case, intended to conduct a serious marketing effort as to [Duro's] business." Memorandum at 11, App.II at 551. In the memorandum's most critical passage, she stated:

> [Duro's and ARK's] argument that the evidence about the scope and nature of the marketing efforts had already been fully disclosed, such that there is no new evidence here to justify vacating the order, misses the point: the Committee was not deceived as to what had happened before approval of the final financing order, but as to what efforts [Duro] and [ARK] intended to make from the date of that order going forward. At least as of the approval of the agreed financing order, [Duro] and [ARK] had placed themselves under an obligation to the creditors to market the assets fairly and (at least on [Duro's] part) with diligence befitting a fiduciary. Whatever may have been the marketing plans before the agreed financing order, that order and the underlying agreement created new obligations and new expectations. The Committee was fully entitled to expect appropriate marketing efforts would immediately be undertaken. The Committee could not have known at the hearing that this promise

of a share in the upside would not be matched by prospective marketing efforts designed to fairly test the possibility of a recovery upward of $32 million.

> The final financing order was thus obtained under, if not false pretenses by [Duro and ARK], at least a misunderstanding as to the scope of the … marketing effort to which [Duro and ARK] had in effect committed themselves. They promised the Committee a share in any proceeds in excess of $32 million without any *bona fide* intent to solicit bids that might exceed that threshold. The promise was made by [Duro and ARK] alike without intent to honor the implicit marketing requirement, and the Committee relied on the promise to its detriment. On this basis I conclude that there existed cause—fraud and misrepresentations by [Duro and ARK]—to vacate the final financing order. Fed.R.Civ.P. 60(b)(3), made applicable by Fed. R. Bankr.P. 9024.

Memorandum at 12–13, App.II at 552–53. The judge went on to discuss how her vacating the financing order, as opposed to dismissing the case, would impact the parties, and how she came to the conclusion, with the parties' agreement, to dismiss Duro's Chapter 11 case.

### b. Right to Relief

Strikingly, the memorandum does not single out any one individual for censure. One witness (Mr. Hymes, one of the petitioners) and several attorneys (none of whom are petitioners) are mentioned by name in the course of the memorandum, but the mentions are narrative and descriptive only. In no meaningful way can any of the petitioners claim that he was the object of an "actual adjudication of misconduct," professional or otherwise. *See In re Calore Express Co.,* 226 B.R. at 733 (discussing possible adjudication of at-

torney misconduct). Not one of the petitioners can say that he, individually, has been "chastised" in an instance of "unwarranted judicial excess." *See In re Williams,* 156 F.3d at 92–93. Nor can Duro or ARK. Like the others, they can only complain that the judge's criticisms were unwarranted and that they had insufficient opportunity to be heard.[14]

We realize that the memorandum of decision was, in the truest sense, unnecessary. And we understand petitioners' noses being out of joint about comments they consider both negative and gratuitous. Nevertheless, they have demonstrated neither erroneous judicial *action* nor irreparable harm. Assuming jurisdiction to issue the writ, this is a nose-on-your-face plain instance where its issuance is not warranted.[15]

### Conclusion

Much more could be said, but need not be. For the reasons set forth above, the appeals are DISMISSED for lack of jurisdiction; the petition for mandamus is DENIED.

---

**14.** Duro and ARK have asserted that the memorandum's conclusions may somehow prejudice them in related litigation, but they concede (as do the parties opposing mandamus) that any "findings" of fraud the memorandum sets out can have no issue preclusive effect in any forum, they were utterly surplus to the *consented to* dismissal order. *See Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 30 (1st Cir.1994) (for collateral estoppel to operate, finding in question must have been

"actually litigated" and "essential to the judgment").

**15.** Our determination not to issue the writ should not be read as an endorsement of the bankruptcy judge's choice to issue her memorandum of decision. The memorandum was surplus to the case's administration and adjudication in every respect. Nevertheless, it is not the stuff of mandamus.